## Stewart Will.

Argued April 11, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Cecil P. Harvey,* for appellants.

*John Lamon,* for appellee.

OPINION BY MR. JUSTICE JONES, May 28, 1946:

This is an appeal from a decree setting aside the alleged last will of John Stewart, deceased, and revoking letters testamentary thereon, on the ground that the testator's execution of the writing was procured by fraud and undue influence practiced upon him by the

proponents. Stewart died on August 5, 1943, resident in Philadelphia. The alleged will was probated before the Register of Wills for Philadelphia County on August 16, 1943, upon offer thereof by the executors named in the will to whom letters testamentary were granted.

An appeal from the probate was taken to the court below by Andrew Stewart, the decedent's surviving brother and sole next of kin. On the contestant's further petition for an issue *devisavit vel non,* the learned judge who took testimony in that matter concluded that, while the evidence was insufficient to justify a finding that the decedent lacked testamentary capacity, the attendant circumstances shown by the testimony with respect to the decedent's physical and mental condition, the drafting of the will and its execution were such as to cast upon the proponents the burden of establishing affirmatively that the decedent's execution of the alleged will was his own free and voluntary act and that, failing such proof by the proponents, the evidence would justify a finding that the will was procured by undue influence practiced upon the decedent by the proponents. Accordingly, the hearing judge awarded a conformable issue which was tried before him and a jury in the Orphans' Court. The trial resulted in a verdict finding the will to be the product of undue influence as alleged. The proponents moved for judgment n. o. v. which was refused by the court en banc and the final decree from which the proponents now appeal was thereupon entered.

The appellants assign for error the trial court's refusal of their point for binding instructions, the refusal of their motion for judgment n. o. v. and the entry of judgment on the jury's verdict. However, the final decree which actually set aside the alleged will and revoked the letters testamentary is not assigned for error.

The appellants contend that the will, being in due form as required by law, was presumptively valid and that nothing was shown by the testimony which required the proponents to fortify the presumption of validity

with affirmative proof as to the regularity of the testator's execution of the alleged will.

The testimony on the trial of the issue, which was substantially the same as had moved the hearing judge to grant the issue, disclosed the following facts.

On October 10, 1941, the date of the alleged will, the decedent, who was then seventy-five years old, was living alone in a first floor apartment of a house which he owned at 24 South 59th Street, Philadelphia. He had resided there many years with his wife who had died on September 25, 1941,—just fifteen days before the alleged will was executed. The decedent's only blood relatives were two brothers who lived in Ireland and whom he had not seen in forty years. However, he kept in touch with them by correspondence and sent them money from time to time, both of the brothers being in impoverished circumstances. Mrs. Stewart had two sisters who lived in the suburbs of Philadelphia and also two nieces, viz., Mrs. Margaret J. Layton and Mrs. Isabella Logan Kruger, daughters of one of Mrs. Stewart's sisters. She also had several grandnephews and grandnieces. The relations between the Stewarts and Mrs. Stewart's relatives were friendly.

Mr. Stewart had been in poor health for many years. He suffered from a cardiac condition, diabetes and interstitial nephritis which required the regular attention of a physician who had visited the patient "on an average of one to four times a month for 17 years". The death of Mrs. Stewart was an especially heavy blow to her husband. She had had the entire management of their affairs and was his nurse; ". . . her whole business in life [was] to see that he got the right diet for a diabetic"; ". . . she went to the doctor's for him and described his condition, and had medicine given to her and she brought it home" (proponents' testimony). After his wife's death, the decedent was melancholy and dazed and frequently broke into crying. His physician, who visited

him on October 6, 1941, and, again, on November 8, 1941, testified that he was in bad health; that, while his mind was as good as it had been for years, he was never very alert mentally; and that his mental condition was "such that he could have been the victim of designing persons".

A day or two before October 10, 1941, John E. Layton, the husband of Mrs. Stewart's niece, visited Stewart at his apartment for the purpose, as Layton testified, of consulting with Stewart, at the latter's request, about the installation of an oil burner in his house. At the conclusion of that conversation, Layton inquired whether there was anything else he could do for him and Stewart said he would like to have a will drawn. Layton told him he should see a lawyer but Stewart answered that he did not want to go into town and get a lawyer. Stewart told Layton how he wished to dispose of his estate by will and Layton went to the office of a lawyer in mid-city who drew the will now in contest. If Stewart requested Layton so to act, it appears only inferentially in the testimony. When the lawyer had drafted the will, Layton carried it home and the next morning took it with him, ultimately reaching Mr. Stewart's apartment between ten and eleven o'clock. He had told Mrs. Layton before leaving home of his intended visit to Mr. Stewart and, when he arrived there, he found Mrs. Layton had preceded him. She testified that she had been summoned by telephone but, by whom, she did not say. The Laytons and Stewart sat at the dining room table. Layton handed the will to Stewart who immediately passed it back telling Layton to read it to him, which Layton did. Stewart then signed it. Mrs. Buckley, a part-time worker in the Stewart household, was in the kitchen. Layton called her in and she signed as a witness. She testified that she did not know it was a will; that no one told her it was; and that she signed at Layton's request. After Mrs. Buckley had signed, Layton took the will upstairs to the apartment of Mr. and Mrs. Hammerslay both of whom also signed as witnesses. Hammerslay, who did

not know Layton except for having seen him possibly once or twice, testified that the paper was so folded that he could not see what it was and that Layton told him it was a power of attorney. Mrs. Hammerslay, who was an invalid, signed at the request of her husband without having talked to Layton. The Hammerslays had moved into the second floor apartment following Mrs. Stewart's death and it is very doubtful from their testimony whether they knew Stewart's signature. In any event, the decedent did not sign or publish the writing as his will in the presence of any of the subscribing witnesses; none of them signed in the presence of each other except for Mrs. Hammerslay's signing in the presence of her husband; and none of them signed at the request of Stewart. (While the latter matters relate to requisites of probate, they presently have incidental bearing on the question of the regularity of the execution of the will.) Having obtained the Hammerslays' signatures to the will, Layton went downstairs and handed it to Stewart who requested him to "take it and take care of it". Layton took it with him and retained its exclusive custody until it was offered for probate twenty-two months later. Except for the relatively brief time the will was on the table when Stewart signed it, he never saw it and, manifestly, never had possession of it.

The will disposed of Stewart's $8,000 estate by making a bequest of $200 to each of Stewart's two brothers in Ireland, provided they survived him, and by devising and bequeathing the residue to Mrs. Layton and her sister, Mrs. Kruger, in equal shares. Mrs. Layton and her husband were named executors. One of the brothers predeceased the decedent so that his legacy lapsed. The will was couched in appropriate legal phraseology but there is not a word of testimony that Stewart understood its import. Nowhere is there any affirmative evidence that Stewart had indicated at any time that his signing of the paper was his free, voluntary and understanding act. The lawyer who drew the will did not know Stewart

and had had no direct communication with him; he received all of his information from Layton; and was not present when the will was signed.

Layton's credibility was in issue with respect to what he had told Hammerslay he wanted him to witness. He did not even dispute Mrs. Buckley's testimony that no one had told her it was a will she was witnessing and that she was not present when Stewart signed. There was also testimony that Stewart had frequently mentioned his brothers in Ireland, subsequent to the date of the execution of the will, and had stated his intention to provide for them. He corresponded with them and sent them money from time to time. There is in the record a letter to the decedent from the surviving brother dated July 20, 1943, in evident response to a letter of July 15th from the decedent. Yet, Layton, who had known Stewart for twenty-one years, testified that he "didn't know until the time the will was made that [Stewart] had two brothers" although Mrs. Layton knew that he had some relatives in Ireland.

We find no error in the acceptance by the learned court below of the jury's verdict that the will in question was procured through undue influence practiced upon the decedent by the proponents. Upon the rendition of the verdict the trial judge, who had sat as a chancellor, expressed his satisfaction with the verdict by telling the jury that ". . . my opinion is that your verdict is justified under the circumstance". And, it is our opinion that the evidence as a whole fully warranted the verdict which, accordingly, satisfied the conscience of the chancellor.

We do not agree, however, that, in passing upon the proponents' motion for judgment n. o. v., the court below was required to view the verdict on the basis of the facts and inferences most favorable to the successful party. (Compare *Morrish Estate*, 156 Pa. Superior Ct. 394, 40 A. 2d 907.) Such is the rule in an action at law where the jury is the sole judge of the facts. But, in

the trial of an issue *devisavit vel non,* where the trial judge sits as a chancellor, his conscience must be satisfied with the justness of the verdict on the basis of all of the evidence. If the chancellor is not so satisfied, he may set aside the verdict even though it might otherwise be found sustainable solely upon the facts and inferences most favorable to the verdict. Once the chancellor approves and accepts the verdict, it becomes binding in the will contest in the Orphans' Court as determinative of the fact so established: *Cross's Estate,* 278 Pa. 170, 184, 122 A. 267. But, " 'In every case tried before a jury in which the trial judge sits as a chancellor, the evidence is addressed to him quite as much as to the jury—it must as a whole be judged by him independently of the jury— must satisfy his (legal) conscience as well as the jury— and cannot be rightfully submitted to the jury as a basis of any finding which he would not approve; in a word, he cannot permit the jury to do what he as a chancellor (after weighing the evidence in the light of the established law upon the subject) would not do' ": *Phillips' Estate,* 244 Pa. 35, 42, 90 A. 457, quoting with approval from opinion of Judge ENDLICH in *Caughey v. Bridenbaugh,* 208 Pa. 414, 415, 57 A. 821, affirmed per curiam.

The foregoing quotation was spoken with respect to a jury's verdict on the trial of an issue d. v. n. certified to the Common Pleas under the practice obtaining prior to the Act of July 1, 1937, P. L. 2665, 20 P. S. §2585. It is no less applicable to a jury's verdict in the trial of an issue in Orphans' Court under the provisions of that Act. The Act of April 22, 1905, P. L. 286, 12 P. S. §681, which provides for the filing of motions for judgment n. o. v., is adaptable to the trial of an issue d. v. n. only to the extent of the procedure it prescribes for raising the alleged invalidity of a verdict as a matter of law. It does not import into the question of the sustainability of a verdict on an issue d. v. n. the binding effect of the rule as to the evidence permissibly cognizable in testing a verdict rendered by a jury in a trial at law.

A more serious question is whether the evidence adduced in the proceeding below supplied all of the factual elements necessary to place upon the proponents the burden of showing that the execution of the will was the decedent's voluntary and uncontrolled act and was not the result of constraint, coercion or undue influence practiced upon him by the proponents. As stated in *Adams's Estate*, 220 Pa. 531, 533-534, 69 A. 989, "The general rule applicable in such cases is that although the evidence is not sufficient to establish testamentary incapacity . . . , but does show bodily infirmity and greatly weakened mentality, a presumption of undue influence arises where a stranger to the blood of the testator, standing in a confidential relation, is benefited by the will which he has been instrumental in having executed". See also *Llewellyn's Estate*, 296 Pa. 74, 82, 145 A. 810; and *Phillips' Estate*, supra, at pp. 43-44.

The facts of the instant case fully meet the requirements of the rule above stated. That Layton was instrumental in having the will executed; that his wife, for whose interest he was concerned, took a large share of the estate under the will; that both he and his wife were strangers to the decedent's blood; and that Stewart was infirm in body and weakened in mind through illness and grief,—all very plainly appears. And, that Layton's relation to the decedent with respect to the will was one of confidence is not open to reasonable dispute under the circumstances shown. He was the only person to whom Stewart confided his testamentary desires. It was he who accepted the responsibility of reading the will to Stewart and permitted him to sign it without reading it. And, immediately upon the execution of the will, it was Layton to whom Stewart entrusted its exclusive custody and control. No particular words or form are required to create a relationship of confidence. Such a relation may be found inferentially from circumstances as well as from direct proof. "In general it may be said that a confidential relation will be deemed to exist when-

ever the relative position of the parties is such that the one has power and means to take advantage of, or exercise undue influence over the other: [citing cases]": *McCown v. Fraser*, 327 Pa. 561, 565, 192 A. 674.

With the burden upon the proponents to establish affirmatively regularity of conduct and good faith on their part in connection with the execution of the will, a substantial dispute of fact was at once injected which properly called for an issue d. v. n. for its solution: see *Lare Will*, 352 Pa. 323, 329-330, 42 A. 2d 801. We find no abuse of discretion either in the granting of the issue or in the chancellor's acceptance of the jury's verdict.

The decree is affirmed at the appellants' costs.