## Dichter Will.

Argued May 29, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Morris M. Berger,* for appellants.

*George R. Craig,* with him *Shrum, Harrison & Craig,* for appellees.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, June 25, 1946:

This is an appeal from a decree of an orphans' court (one judge dissenting), dismissing an appeal from the probate of a will and refusing to grant an issue devisavit vel non. The allegations were (1) mental incapacity (2) undue influence.

Daniel M. Dichter, the decedent, died January 5, 1944, aged 78 years. The official death certificate gave

the cause of death as "Cardiac Dilation due to Arteriosclerosis Psychosis". His next of kin were a brother and two nephews, issue of a deceased brother. The estate was valued at $7,000. All of the property (except 50 shares of stock of the Mesta Machine Company) had been owned by testator and his wife as tenants by the entireties. The wife predeceased testator, dying in December, 1943, a week prior to her husband's death. Testator, a pensioned employe of the Mesta Machine Company, had retired in November, 1940 because of disability due to illness. He and his wife had maintained a joint bank account in the Colonial Trust Company, a Pittsburgh bank. Raymond D. Wetherell, a proponent and chief beneficiary under the will, was an officer of the bank. Mr. Wetherell testified that he first met testator and his wife *"about 1942"* when the account was opened. Later he said he knew decedent and his wife for "twenty years"; that "it was 1922" when the account was opened in the bank; the learned hearing judge found that Mr. Wetherell first met decedent about 1935. But irrespective of the correct date, Mr. Wetherell testified that his only connection with the decedent and his wife was as teller at the window of the bank when he waited upon them as customers. He said that on one occasion he explained to decedent the nature of the various issues of United States Government War Bonds and advised him as to which issue was most suitable for his requirements. It does not appear that he ever visited the decedent and his wife. After the wife's death proponent arranged for decedent's admission into a nursing home and he took him there.

Proponent testified that on the date of the will, October 2, 1942, decedent and his wife came to the bank and informed him that they desired to make a will. He asked them if they had ever written a will and they told him that Mr. McWhinney had previously written their wills. Decedent said that they did not wish to go back to him because Mr. McWhinney was the attorney for his brother-in-law. (Mr. McWhinney later testified that he

had written reciprocal wills for decedent and his wife in May, 1940 and under these wills the decedent and wife had left their estates to named nephews and nieces of both of them). Mr. Wetherell said decedent and his wife asked the name and address of the lawyer whom decedent had previously known, and who was the personal attorney for Mr. Wetherell. Mr. Wetherell said it was Bruce Harrison, Esq., of the law firm of Shrum, Harrison and Craig. Decedent stated that this was the man he was looking for. The name and address of Mr. Harrison was then written by Mr. Wetherell on the back of a deposit ticket. Mr. Wetherell then called Mr. Harrison on the telephone to inquire if he was in. Mr. Wetherell informed the decedent that the lawyer was in and was waiting in his office. A bank guard who participated in part of the conversation, showed the decedent and his wife the way to go to the lawyer's office. (Bruce Harrison, Esq., the scrivener, died after he had prepared the will, which he had witnessed, and assisted in its probate).

By the will decedent directed the lettering of headstones for himself and his wife; gave $100 for Masses for himself and, if his wife predeceased him, $100 for Masses for the wife; gave all the residue of the estate unto the wife absolutely, or if she predeceased him, then $25 to the pastor of his church; $100 to Mrs. Hazel Heath; $25 to the Little Sisters of the Poor; $100 to Mrs. Emma Schwartz; $200 to a church at Homestead for Masses for his two named deceased children; the sum of $700 to the trust company, in trust, for the perpetual care of graves and the rest, residue and remainder to "my friend, Raymond D. Wetherell" who was appointed executor.

Proponent testified that shortly after the execution of the will decedent gave it to him and also the will of the wife. Decedent asked Mr. Wetherell to keep the wills for him, which the witness did. (The wills were reciprocal).

The will was witnessed by the scrivener, Mr. Harrison, and by G. D. Shrum, Esq., Mr. Harrison's law

partner (who was not acquainted with the decedent), and Miss W. A. Heiser, a secretary employed by the firm (who had seen the decedent and his wife once before going into Mr. Harrison's office). All three witnesses to the will swore before the register that they had seen the decedent sign his name and at the time of so doing he was of sound and disposing mind, memory and understanding. The wife's pastor and the bank guard testified that in their opinions decedent possessed testamentary capacity. Contestants produced two physicians and nine lay witnesses, all of whom testified that in their opinions decedent was mentally incompetent to execute the will on October 2, 1942.

The learned hearing judge in refusing to grant an issue wrote: "If the testimony offered to prove the incompetency of testator before and after the execution of the will had been related to the time of its execution on October 2, 1942, it would be necessary to grant an issue." Also "It [contestants' testimony] was not exaggerated or tainted by deceit or cunning for personal gain but, on the contrary, it came largely from disinterested and credible witnesses who had abundant opportunities for observation. From their viewpoint the testator was before and after the execution of the will in a far advanced state of senility from which he could not have recovered sufficiently on October 2, 1942 to execute a will and was at the time of its execution unable to legally dispose of his property." The court below ruled that the testimony of proponent's witnesses concerning decedent's mental capacity *on the date of the execution of the will* overcame the testimony of contestants' witnesses as to decedent's mental incapacity on that date, derived from observations made near October 2, 1942. The court below regarded contestants' evidence as possessing no probative value. With this we disagree. In the circumstances of this case, we regard that evidence as material and admissible.

It is true that evidence of testamentary incapacity, to be relevant, must relate to the time of execution:

*Herster et al. v. Herster et al.*, 122 Pa. 239, 16 A. 342; *Wertheimer's Estate*, 286 Pa. 155, 133 A. 144; *Guarantee Trust & Safe Deposit Co. v. Heidenreich et al.*, 290 Pa. 249, 138 A. 764; *Phillips's Estate*, 299 Pa. 415, 149 A. 719; *Olshefski's Estate*, 337 Pa. 420, 11 A. 2d 487. But evidence of incapacity near the date of the will is admissible: *Pidcock et al. v. Potter*, 68 Pa. 342; *Swails et ux. v. White et al.*, 149 Pa. 261, 24 A. 292; *Surface v. Bentz*, 228 Pa. 610, 77 A. 922; *Aggas v. Munnell et al.*, 302 Pa. 78, 152 A. 840. An excellent statement of these principles may be found in 68 Corpus Juris, section 71 k, pages 463, 464: "Although a testator's capacity to make a will is to be determined by his condition at the time of its execution, evidence of his capacity near that date either before or after execution may, depending on the circumstances of each case, be material and admissible, especially in case of a progressive or permanent disease. Such evidence is admissible only for the purpose of showing the condition of the testator's mind at the precise date when the will was executed." See: *Irish v. Smith*, 8 Sergeant & Rawle 573; *Wertheimer's Estate*, 286 Pa. 155, 133 A. 144; *Brennan's Estate*, 312 Pa. 335, 168 A. 25.

Our study of the testimony convinces us, in the circumstances of this particular case, that the observations of contestants' witnesses concerning decedent's mental capacity were made sufficiently near October 2, 1942, to enable them to express their opinion of decedent's mental capacity *on that date*.

It was clearly established that this 78 year old decedent, retired from work because of sickness and disability, suffered and died from a progressive and permanent disease. Dr. Campbell testified that he had been the surgeon for the Mesta Machine Company for thirty years, and had known the decedent, an employe, for at least fifteen years. In November, 1940 he examined decedent and found a stomach condition which caused decedent to quit his employment and go on a pension. While

the doctor testified without his records, and from memory, he said that he had treated decedent professionally from November, 1940 until decedent's death in January, 1944. He testified that he saw him professionally frequently during 1942—the first part of the year at least twice a week and after that at least once a month. In 1943, he visited decedent occasionally, but was not the attending physician when he died. The doctor testified, "I observed that he had arteriosclerosis, high blood pressure and mental deterioration, commonly called softening of the brain, a chronic condition which is incurable and never gets better after it once starts." He testified that in his opinion decedent did not possess the mental capacity to make a will on October 2, 1942. He assigned as his reason "Because he (decedent) was of unsound mind. He really had what is called senile dementia." Dr. Malcolm, the other physician, was on the staff of St. Francis Hospital (having an important mental clinic), Mercy Hospital, and was assistant professor of neurology at the medical school of the University of Pittsburgh. Decedent was brought to St. Francis Hospital for observation and remained there from September 27 until October 2, 1943 and was under the charge of Dr. Malcolm. The doctor diagnosed his condition as "generalized arteriosclerosis, a hardening of the arteries, and a marked arteriosclerosis in the eyes," that the mental symptoms had been present for eighteen months to two years prior thereto, and that in the opinion of the doctor on October 2, 1942 decedent would not have been competent to have made a will.

We need not relate, in detail, the testimony of the nine lay witnesses as to decedent's mental capacity to make a will on October 2, 1942. It is true that none of them saw decedent on that particular day. However, they testified as to occurrences and circumstances shortly before and after that date, to enable them to testify as to their opinions of the competency of decedent on the date of the execution of the will.

*Olshefski's Estate,* 337 Pa. 420, 11 A. 2d 487, relied upon by the court below, is distinguishable from the present situation. In that case a verdict of a jury on a trial of an issue d. v. n. was set aside because of the overwhelming weight and character of proponent's evidence. There the decedent told the scrivener "everything she owned and the disposition she desired to be made of it, and that in doing so, she named each of her children individually and determined just what each should receive." The clarity of decedent's mind was corroborated by the other subscribing witnesses. The doctor's testimony that, from his observation of decedent three months after the execution of the will, she was mentally incompetent "was not grounded upon any definite or real knowledge of (decedent's) testamentary capacity at the time she executed her will." Such opinion was not supported by substantial facts.

We are not unmindful of the fact that decedent's wife, four years younger than decedent, made a reciprocal will. On a trial of an issue, this may or may not prove to be a relevant fact. However, in the present proceeding, the mental and physical condition of the wife was not shown, nor is it here material. None of the wife's estate passes to the present proponent under *her* will because all property (except the Mesta stock owned by the husband alone) was held by the husband and wife as tenants by the entireties.

Upon a review of all the evidence, it is disclosed that a substantial dispute exists as to the decedent's mental capacity on October 2, 1942 to make a will, which requires submission to a jury for determination: *De Laurentiis's Estate,* 323 Pa. 70, 186 A. 359; *Lare Will,* 352 Pa. 323, 42 A. 2d 801.

We are of opinion that an issue should also be granted to determine whether or not the writing of October 2, 1942 was procured by undue influence.

This decedent was aged and mentally and physically sick and infirm. His will passes the bulk of his estate

to a stranger to the blood—an officer-employe of dece-
dent's bank. Proponent stated that he had had no rela-
tions with decedent except at the teller's window at the
bank; that he had sent decedent to his (proponent's)
lawyer to have the will drawn; he had telephoned to
the lawyer for an appointment for decedent; after the
will had been executed it had been kept in proponent's
possession until the death. In all these circumstances a
confidential relationship was established. No imputa-
tion or suspicion of wrongdoing is attributed to the
reputable attorneys who drew the will. However, there
should be more specific evidence to establish that dece-
dent had an intelligent understanding of his testamen-
tary dispositions. We do not agree that the testimony
of the subscribing witnesses, and the offer of the record
of probate in evidence, under *Keen's Estate,* 299 Pa.
430, 149 A. 737; *Plotts' Estate,* 335 Pa. 81, 5 A. 2d 901;
*Szmahl's Estate,* 335 Pa. 89, 6 A. 2d 267, established a
prima facie case which the evidence of the contestants
did not rebut. As Mr. Justice HORACE STERN stated in
*Szmahl's Estate,* supra: "The acceptance in evidence of
the probate merely shifts to contestants temporarily the
duty to come forward with evidence . . ." Id. at page
93. It is pointed out that the burden of proof rests upon
the proponent throughout, but that the "burden of com-
ing forward with evidence (may) pass back and forth
from one side to the other." As we have indicated above,
Mr. Wetherell was a stranger to the blood; he occupied
a confidential relation to decedent who was an old, sick
and mentally and physically infirm man; he received the
large bulk of the estate under the will; he was instru-
mental in arranging for decedent to go to the office of
proponent's own attorney; and he kept the will in his
custody after it was executed. In these circumstances,
the burden shifted to the proponent to demonstrate that
the bequest was free from fraud, coercion, inordinate
flattery or imposition and with a full understanding and
intelligent perception on the part of decedent concern-

ing the disposition he desired to make of his property to the persons and objects named in the will as the recipient of his bounty. See *Stewart Will*, 354 Pa. 288, 47 A. 2d 204. Such an issue must be decided by a jury.

The decree is reversed and the record is remanded to the court below, with direction to grant the issue devisavit vel non as prayed for. Costs to be paid by the appellees.

---

OPINION BY MR. JUSTICE JONES (concurring in part) :

I fully agree that the testimony of the contestants' witnesses, whom the learned hearing judge expressly accredited, makes inescapable the award of an issue to determine whether the decedent possessed testamentary capacity at the time of the execution of his alleged will. A substantial issue of fact with respect to that question is plainly disclosed by the record. But, equally, I am unable to perceive the evidence which would justify a chancellor in accepting a jury's verdict against the will on the ground that its execution was procured by fraud and undue influence practiced upon the decedent.

The factual situation necessary to cast upon the proponent the burden of establishing affirmatively the propriety and regularity of the execution of the will is not present. It may at once be conceded that the evidence would justify a finding that at the time of the execution of the will the decedent was aged and weak in mind (whether lacking testamentary capacity or not) and that the proponent, a stranger to the blood, was given a large share of the estate by the terms of the will. But, there is nothing to support a finding that a *confidential relation* obtained between the decedent and the proponent. And, the existence of such a situation is essential to an application of the rule which the majority opinion invokes: *Stewart Will*, 354 Pa. 288, 47 A. 2d 204; *Llewellyn's Estate*, 296 Pa. 74, 82, 154 A. 810; *Phillips' Estate*, 244 Pa. 35, 42, 90 A. 457; *Adams's Estate*, 220 Pa. 531, 533-534, 69 A. 989.

The proponent's only contacts with the decedent and his wife were when they, for business purposes, periodically visited the bank where the proponent held a responsible position. He had never visited them in their home nor had he met with them socially or for other purposes elsewhere. And, the only time he ever gave them any advice was with respect to the particular series of War Bonds best suited to the decedent's investment. For a service in such regard, the proponent had become expertly qualified for the benefit of the bank's inquiring customers in general.

The will in question, as well as a reciprocal will of the decedent's wife, was drawn by Bruce Harrison, Esq., a reputable and highly esteemed member of the Allegheny County bar. True enough, Mr. Harrison was also the legatee's attorney; and, in last analysis, it is that relationship upon which the suggestion of *undue* influence depends. But, the wills were drawn and executed *in the attorney's office* upon a visit there for that express purpose by Mr. and Mrs. Dichter (the decedent and his wife) *unaccompanied by anyone else.* He was not unknown to the Dichters for whom he had earlier performed a professional service. Upon going to the bank the day the wills were drawn, the decedent and his wife asked the proponent the name of the attorney to whom he had sent them before. He said that it was Mr. Harrison. They told the proponent that they wanted to have wills drawn. He asked them if they already had wills and they said they had, telling him the name of the attorney who had drawn them. The proponent suggested that they again consult the same attorney, to which the decedent demurred for a sufficient personal reason which he expressed. The proponent then called Mr. Harrison by telephone to see if he was in his office and found that he was. This telephone conversation took place in the bank lobby in the hearing of the Dichters and a bank usher who then escorted Mr. and Mrs. Dichter to the Fourth Avenue exit of the bank and pointed

out the office building up-street to which they went alone to see and consult with the attorney in *his* office. Unfortunately, Mr. Harrison who was also a subscribing witness to the wills, died prior to the hearing in the court below on the appeal from the probate. There is not a scintilla of evidence from which it could be directly found or reasonably inferred that Mr. Harrison incorporated a single thing in the reciprocal wills other than the personally expressed testamentary desires of the decedent and his wife, unprompted and not *unduly* influenced by anyone.

It is, of course, unavoidably true that a reputation for honor and integrity is not a safeguard against the involvement of one's name in unpleasant litigation, even after death. But, such involvement should at least rest upon probable cause. How the evidence in this case warrants any imputation of fraud and undue influence in the execution of the decedent's will, it is not possible for me to see. Certainly a chancellor at the trial of such an issue should have more than what this record now discloses to justify him in accepting a jury's verdict against the will on that ground. Furthermore, it would seem that, upon a trial of that issue, the wife's mentality and physical condition would also be highly relevant and material. As already indicated, she executed a reciprocal will on the same day and under the same circumstances, —subsequently predeceasing her husband by a week. If she was sound of mind and not *unduly* influenced, she had a right to expect that the property would ultimately pass as she and her husband by their wills had reciprocally provided.

The will is by no means an unnatural one even though the proponent had seen and conversed with the decedent and his wife only upon their monthly or so visits to the bank over a period of years (about twenty). The status of "stranger to the blood" requires for its full legal import that there be blood relatives who were likely objects of the testator's bounty. In the present

instance Mr. Dichter had one brother who lived in Germany and from whom he had not heard for years. It was not even known that the brother was alive. He also had two nephews, who lived in Erie, only a hundred miles away, but who were not sufficiently interested in their uncle either to communicate with him or visit him in the eighteen years prior to his death. That the decedent and his wife, in making their wills, were cognizant of those really close to them is in part evidenced by the fact that, among their bequests, they provided for masses for their deceased children.

At most, the suggestion of undue influence in this case has nothing more to support it than a shadowy suspicion; and, that is not enough: see *Ash Will*, 351 Pa. 317, 324, 41 A. 2d 620; *Rosenthal's Estate*, 339 Pa. 488, 496, 15 A. 2d 370. Under the present record, it is no less reasonable to infer that the beneficent disposition of the decedent and his wife toward the proponent was the result of his courtesy and kindliness to them rather than to any over-reaching on his part. In my opinion, therefore, the injection of undue influence is unwarranted.

Mr. Justice DREW joins in this opinion.

Mr. Justice PATTERSON dissents.