## Brindle Will.

54

Argued May 27, 1948. Before Maxey, C. J., Drew, Linn, Stern, Patterson, Stearne and Jones, JJ.

*William W. Litke,* with him *Horace J. Culbertson* and *Fleming & Litke,* for appellants.

*Harold W. Houck* and *Harry L. Siegel,* with them *Albert Houck, Robert Siegel* and *Robert Stuckenrath,* for appellees.

OPINION BY MR. JUSTICE LINN, July 7, 1948:

There are four appeals, two from the common pleas and two from the orphans' court. They involve the property of Anna Fox Brindle who died April 7, 1944, leaving a will dated March 10, 1942, probated April 10, 1944. She left surviving a brother, Frank Fox, and a number of cousins. By this will she gave her property [1] to F. W. Steffey in trust for her brother for life, with the right, in specified circumstances,[2] to use the principal.

---

[1] After deducting debts, expenses and taxes, the amount for distribution is about $140,000.

[2] "In the event the said income shall be insufficient for the proper maintenance, support and keep of the said Frank Fox, by reason of illness or otherwise, I direct that the said trustee shall use and pay so much of the principal of the trust as may be necessary, from time to time, for such purpose or purposes. The payments to or for the use of my brother, Frank Fox, shall be made quarterly."

She devised her homestead, on the death of the brother, to Mildred Watts Zook, and directed that the rest of her property be divided equally between Mrs. Zook and F. W. Steffey. Neither Mrs. Zook nor Steffey was in any way related to her. Mr. Steffey was also appointed executor. Belleville, where she resided, is a small village of about 1200 inhabitants in Mifflin County. It contained a national bank of which Mrs. Zook's husband was president, and F. W. Steffey, cashier. Testatrix was about 73 years of age when she made her will and about 75 when she died. Her only surviving brother, Frank Fox, was then about 67 years of age and was described as "a helpless, incurable incompetent, requiring constant attendance of some person to feed and care for him." After testatrix's death Frank L. Campbell was appointed guardian of Frank Fox in a proceeding initiated by F. W. Steffey. The first cousins, who, except her brother, were her nearest relatives, concluded that an appeal from the probate should be taken for lack of testamentary capacity, fraud and undue influence in procuring the will, but Mr. Campbell, the guardian of the incompetent, declined to proceed. They then applied to the common pleas, whose ward the incompetent was, for the appointment of a guardian ad litem, to take the appeal. The court appointed William A. H. Brindle guardian ad litem and authorized him to appeal. He was also appointed "guardian and trustee ad litem of Frank Fox" by the orphans' court. F. W. Steffey and Mildred Watts Zook were permitted to intervene in the proceedings and petitioned both courts "to vacate the various decrees that had been made appointing William A. H. Brindle guardian ad litem and authorizing him to proceed with the appeal and praying the Court to strike the appeal from the probate of the will of Anna Fox Brindle, deceased, from the record."

The parties, with the approval of the court, agreed that these proceedings should be heard together. The court received the evidence, revoked the appointments

of the guardian ad litem and the grant of authority to appeal from the probate and struck the appeal from the record. The present appeals complain of those orders.

In his opinion written in support of those conclusions, the learned judge said, "the only question now before the Court is whether the appointment of the guardian ad litem should be revoked, the decree authorizing him to take an appeal from the probate of the will of Anna Fox Brindle vacated, and the appeal so taken by him stricken from the record." In our judgment, that was not the only question.

The evidence on the appeal from the probate clearly shows a substantial dispute upon matter of fact. The statute provides what shall be done in such circumstances. The Orphans' Court Act of 1917, P. L. 363, section 21(b), 20 PS 2582, provides: "Whenever a dispute upon a matter of fact arises before any orphans' court, on appeal from any register of wills . . . the said court shall, at the request of either party, direct a precept for an issue to the court of common pleas of the county for the trial thereof . . ."

The learned judge, in the course of his decision, did not discuss this phase of the proceedings, an omission probably explainable on the theory that, after he had concluded to vacate the order allowing the guardian ad litem to appeal, there could be no trial of an issue devisavit vel non. He referred to the fact that the incompetent was the ward of the court and that it was the duty of the court to decide what should be best for the ward; that as the will gave the entire net income to the ward with the right in the trustee to use the principal, the ward had substantially all that he could have if the appeal succeeded and the will was set aside and he inherited under the intestate law.

There is no doubt of the power of the common pleas, in a proper case, to determine what appears best for the ward: *Harris Estate,* 351 Pa. 368, 41 A. 2d 715. But before that question is reached on this record, a funda-

mental and more important question must be decided. The evidence shows a prima facie case of lack of testamentary capacity, fraud and undue influence in obtaining the will. The statute provides what shall be done in such case. The ward is not the only party concerned; the next of kin and those who may claim under them have rights under the intestate law. If this will is set aside, as it may be, the basis of the comparison made by the learned judge falls. It falls because there has been no testamentary disposition, the property having passed pursuant to the intestate law. It is this possibility which distinguishes this case from the Harris case relied on by the learned judge; in that case, when the comparison was made, there was a valid will; the elements of the comparison were lawfully established. In the present case, if the contestants succeed, there is no will; there is only a fraudulent transaction. The learned judge erred in assuming that, in passing on the ward's right to appeal, it was immaterial whether a fraud had been perpetrated on the register of wills and on the parties contesting the probate. We think that if the register was fraudulently induced to admit to probate an instrument which was not a will and therefore not entitled to probate, it became the duty of the court, and of all parties to the proceeding, to see that the rights of the parties lawfully succeeding to a decedent's property are respected. A court should not accept the contents of a void instrument as a measure of the exercise of judicial discretion by giving it the effect that would be given to a valid instrument.

On the evidence received it was the duty of the court, pursuant to the statute, to direct a precept to the common pleas for the trial of the issue devisavit vel non. The evidence would support a finding that Steffey stood in a confidential relation to Mrs. Brindle, and, in consequence of that relation, now has the burden of showing that his conduct in and about the preparation and the execution of the will, giving him large benefits, was free from

fraud and the exercise of undue influence: see *Dichter Will,* 354 Pa. 444, at p. 452, 47 A. 2d 691; *Stewart Will,* 354 Pa. 288, 292, 296, 47 A. 2d 204; *Ringer v. Finfrock,* 340 Pa. 458, 461, 17 A. 2d 348. Mr. Steffey testified that he was "very intimately acquainted with Mrs. Annie Fox Brindle and family"; that he managed "part" of Mrs. Brindle's property; drew checks for her; carried checks for her rent to her landlord; delivered her testamentary instructions to the scrivener, who was also his own attorney as well as attorney for the bank; received from him the will; dated it before taking it to Mrs. Brindle; obtained from her keys to her safe deposit box immediately before she was taken to the Bellefonte hospital where she died. He initiated the proceeding for the appointment of a guardian for decedent's brother. Before Mrs. Brindle's death he had arranged for her renunciation as executrix of her brother Floyd's estate and himself obtained letters of administration c. t. a.

Mr. Houck, the attorney who, at Mr. Steffey's request, drew the will, was not called to testify. He represents Mr. Steffey in these proceedings. Instead of receiving Mr. Houck's testimony, the parties put in a stipulation of "what he would testify." It contains the following: "F. W. Steffey of Belleville called me by telephone the early part of March, 1942 and asked for an appointment. He called at my office at the appointed time and stated that Mrs. Annie Fox Brindle requested that I prepare her will. I was handed a memorandum of the matters to be covered.

"The memorandum disclosed that Annie Fox Brindle desired the following to be in her will:

"1. Her entire estate was to be placed in trust for the use of her brother, Frank Fox, during his lifetime. The trustee, who was unnamed, was directed to consume the principal if the income was found to be insufficient for the maintenance of Frank Fox.

"2. After the death of Frank Fox the estate was to be disposed of as follows:

"(a) Homestead and contents to Mildred Watts Zook, who was requested not to sell the contents.

"(b) A pecuniary bequest to Mildred Watts Zook in a blank amount.

"(c) A pecuniary bequest to F. W. Steffey in a blank amount.

"(d) Residue of estate to unnamed person or persons.

"3. F. W. Steffey was to be the executor."

Mr. Steffey testified that he was present while Mr. Houck prepared the will; that he received it that evening and delivered it to Mrs. Brindle "the next morning when I got to the bank." Mr. Steffey noticed that Mr. Houck had left a blank space for the date and testified: "I typed it in the next morning when I saw the date was omitted."

The will is typewritten on two sheets of paper. In a blank space left by the scrivener for the insertion of the trustee's name, are written in ink the words "F. W. Steffey." In the blanks [3] in the 5th and 6th items providing legacies to Mildred Watts Zook and F. W. Steffey are written the words "Five thousand dollars." In the 7th item, providing disposition of the residue after her brother's death are written the words "Mildred Watts Zook and F. W. Steffey, share and share alike." The writing in the will is said to be the testatrix's.

At the foot of the will there is a statement that the witnesses "have, in her presence, at her request, and in the presence of each other, subscribed our names as witnesses hereto." Notwithstanding that statement signed by them, they did not sign in the presence of each other, although, before the register, during probate, they both made oath that they signed as witnesses in the presence of each other. Mr. Steffey testified that he took the witness, McNabb, to Mrs. Brindle's apartment to witness her will. McNabb's testimony is full of inconsistent and contradictory statements. The other witness, Yoder, is

---

[3] The 6th item, as drawn in blank, was "After the death of my brother, Frank Fox, I give, devise and bequeath unto F. W. Steffey, of Belleville, Penna., the sum of ————."

Steffey's assistant cashier and was sent by him to sign as a witness. As to subscribing witnesses see *Plotts' Estate*, 335 Pa. 81, 5 A. 2d 901; *Szmahl's Estate*, 335 Pa. 89, 6 A. 2d 267.

Mrs. Brindle, at or about the time the will was signed, was in bad health; she had not been in good health for some years and was getting worse with time and a progressive disease. She suffered with and was much inconvenienced by a bladder complaint, ultimately dying of carcinoma of the bladder, said, in the death certificate, to have been of two years duration. There is evidence that she had become a miser, was unclean in her person and dress and lived in deplorable conditions. Witnesses testified that she frequently declared that she needed things which she said she could not afford to buy when in fact she had large means. If she was then saying what she believed to be true, did she know of what her property consisted when she made the will?

Dr. Joseph Parrish, a physician residing in Bellefonte and long engaged in general practice, testified that he had known Mrs. Brindle for many years; that his mother, then deceased, was a first cousin of Mrs. Brindle. He had her removed to the hospital in Bellefonte.[4] He testified she was "mentally incompetent to make a will and could have been easily influenced," and gave his reasons for saying so. Mrs. Rena Flynn, a trained nurse, a niece by marriage who had known Mrs. Brindle for many years, testified to a gradual mental and physical deterioration beginning some years before the will was made. Mrs. Flynn resided in New York but visited Belleville several times a year. She gave it

---

[4] "Q. What were the conditions in which you found her in, Dr. Parrish? A. I was called over the Sunday afternoon and things were in a terrible condition in her apartment, she was lying on a bed with her clothes on. Of course, her illness was such she couldn't keep herself clean, the sheets were dirty, the towels were all dirty, dishes, and it was just filthy, and she was obviously a very sick woman, and we just bundled her up in the car and she expressed a wish to go to the Bellefonte Hospital, so we took her over there."

as her opinion that Mrs. Brindle was incompetent to make a will. A number of other witnesses who had known Mrs. Brindle, gave evidence of her gradual failure in body and mind and on that evidence based their opinions that she was incompetent to make a will.

There is evidence that Mrs. Brindle's brother, Floyd, a member of the household composed of Mrs. Brindle and her two brothers, became ill in January or February, 1941, and died February 10, 1942, a month before Mrs. Brindle's will was signed. There is no dispute that he had been the mainstay of the household. His death was a great shock to Mrs. Brindle and hastened her physical and mental deterioration, or at least made the effects of it more obvious than had previously appeared. A physician called by the interveners testified that "early in 1942, after her brother's death" he tried to persuade her to go to a hospital for treatment; that he "suspected a malignant disease," "a malignancy of the pelvic organs" but that she refused to go.

Against the appellants' evidence of testamentary incapacity and undue influence, witnesses called by the interveners testified that while Mrs. Brindle was apparently in wretched condition physically, she knew what she was doing when she made the will. Only a jury can determine the fact; the evidence shows a substantial dispute: Compare *Minnig's Estate*, 300 Pa. 435, 439, 150 A. 626; *Kane's Estate*, 312 Pa. 531, 534, 168 A. 681; *Lare Will*, 352 Pa. 323, 331, 42 A. 2d 801; *Stewart Will*, 354 Pa. 288, 47 A. 2d 204; *Dichter Will*, 354 Pa. 444, 47 A. 2d 691.

We have considered appellees' argument on this branch of the case but, having stated why we think the record discloses a substantial dispute, find it unnecessary to distinguish, seriatim, cases on which appellees rely.

The orders appealed from are reversed and the record is remitted for further proceedings not inconsistent with this opinion; costs to abide the result.

# 63

CONCURRING OPINION BY MR. JUSTICE ALLEN M. STEARNE:

I am in complete accord with the majority opinion.

Proponents of wills may not profit by their own fraud or by the fraud of others. If the questioned testamentary document *was* procured because of testamentary incapacity, or by undue influence, such a will is void and a nullity. There is no difference in the status of such an instrument and one which has been forged or procured through duress. In the eyes of the law no will exists. The decedent dies intestate.

Proponents' argument is irrelevant and unconvincing that the guardian *ad litem* of the mentally incompetent (sole next of kin) should be denied judicial permission to test the validity of the questioned will on the ground that the ward is amply provided for in that document; also that if the will is set aside and the ward inherits the estate absolutely and in fee simple, nevertheless, the ward will be unable to use any more of the funds than he has already had the use of under the questioned will. It is argued that the expense of a will contest might deplete the estate to the ward's injury. It is also suggested that the contest is actually between the proponents and possible next of kin of the incompetent, hence, if the ward is protected for the period of his life, the court should withhold permission to institute a will contest.

No court overlooks or condones fraud. Expediency is no inducement for such action. If this will *was* fraudulently obtained and therefore void, the ward is the absolute owner of the whole estate. *A court charged with the care and supervision of the estate of an incompetent, or any one under legal disability, will not permit the giving away or relinquishment of any part of the ward's estate.* On the contrary, the law strikes down fraud wherever it is met and in whatever guise it appears, irrespective of who may lose or profit thereby.

It is futile to argue that the expense connected with a will contest may jeopardize the care and maintenance of the incompetent. Under the terms of the questioned will the incompetent is entitled to have expended in his behalf all of the income and to consume any part or all of the principal at the discretion of Steffey, the executor and trustee, who takes one half of the estate in remainder. Should the will be sustained, the costs and expenses of the litigation will be paid out of the corpus of the estate—said to net approximately $140,000—for distribution. Such costs and expenses, however, must be approved by the court and must not be excessive. If, however, the will is set aside, the incompetent inherits the entire estate under the intestate law. The costs and expenses of the litigation will then probably be charged against the losing proponents of the will. In these circumstances, in the absence of an agreement between the litigants, an administrator *pendente lite* may be appointed, who, with leave of court, may advance, pending the litigation, the necessary funds for the incompetent's maintenance and care.

If a well defined issue between the contestant and proponents is shown to exist concerning the validity of the questioned will, judicial permission must be granted to the guardian *ad litem* of the incompetent contestant to institute a will contest and to require an issue *devisavit vel non* to be awarded and to prosecute the contest to its final conclusion.

For these reasons I concur in the opinion.

---

DISSENTING OPINION BY MR. JUSTICE HORACE STERN:

According to the majority opinion it would appear that the question whether a will has been obtained by undue influence and whether there was testamentary capacity is a matter of general or *public* concern—something like the prosecution of a crime—and therefore any person whosoever, or even the register of wills himself, may demand and obtain such an issue. No such view,

to my knowledge, has ever heretofore been taken. Even a person having a sentimental, but no pecuniary interest in an estate, has no standing to contest a will; only the heirs or next of kin of a testator, they being the sole persons who would suffer from the probate of a void or improperly induced will, can raise a question as to its validity.

Who is the next of kin of Mrs. Brindle? Not her cousins who have instigated these proceedings, but her brother, Frank Fox, and, if he were in the possession of his normal mental faculties, he and he alone—not *his* next of kin nor any one else—could attack the integrity of her will.[1] And whether or not he desired to make such a contest would have been a matter purely for his own decision. Even if he thought that his sister had been subjected to the importunities of Mr. Steffey (incidentally, there is not the slightest suggestion in the record that *Mrs. Zook* had anything to do with the making of the will or even knew that she was a legatee thereunder), there would not have been any *duty* upon him, as the majority opinion would seem to imply, to demand the granting of an issue to determine the validity of the will; he might well have felt that, because the will gave him not only the entire income but also the right to consume any and all of the principal of the estate if necessary for his proper maintenance and support, he would not care to contest it by attempting to prove that his sister was mentally unsound or that she was imposed upon by their mutual friends; indeed he might himself have preferred that Mr. Steffey and Mrs. Zook should obtain what was left over when he died rather than that in the event of his intestacy such leavings should go to cousins in whom he had apparently no interest whatever.

But Frank Fox being in fact mentally incompetent who is now to speak for him? The law is so clear on

---

[1] The majority opinion refers in this case to the "contestants". Who are the "contestants"? As stated above, only Frank Fox, or his guardian, can contest Mrs. Brindle's will.

that question that there can be no room for doubt. His guardian may not challenge the probate of the will except by obtaining the court's approval of such action. And in such a proceeding the incompetent is regarded by the court as its ward,[2] and the sole issue before it is to determine, not any *public* rights, for obviously there are none, but *whether it is to the best interests of the ward to try to have the will set aside,*—in other words, to resolve for him what he himself would have been called upon to decide if he were mentally able to do so.

The question, then, and the only one in these proceedings, is whether, under all the existing facts and circumstances, the court should grant permission to the guardian of Frank Fox to petition for an issue d. v. n. Or, stating it in the clear language of Judge UTTLEY himself: "The question now before this court . . . is *not* whether an issue devisavit vel non should be granted, *nor* whether, if granted, the trial thereof would probably result in a sustainable verdict against the will. The sole question before us is, would such a contest . . . whether successful or unsuccessful, be for the welfare and best interests of Frank Fox, the incompetent." In that connection I am wholly unable to understand what is meant in the majority opinion by the statement that "There is no doubt of the power of the common pleas, in a proper case, to determine what appears best for the ward: . . . But before that question is reached on this record, a fundamental and more important question must be decided,"—namely, whether or not the will should be upheld. If the latter question is *first* to be decided, of what possible use could it *then* be to determine whether or not it was to the best interests of the ward to *raise* that question? The majority opinion does not undertake to discuss, much less decide, what are the best interests of the ward in regard to the matter, which, according

---

[2] At common law the insane were the wards of chancery, and the Chancellor exercised jurisdiction over their persons and estates.

to every precedent and legal authority, is the *only* issue to be decided in the present proceedings.

The majority opinion states that "The evidence on the appeal from the probate clearly shows a substantial dispute upon matter of fact. The statute provides what shall be done in such circumstances," namely, that "Whenever a dispute upon a matter of fact arises before any orphans' court, on appeal from any register of wills . . . the said court shall, at the request of either party, direct a precept for an issue to the court of common pleas of the county for the trial thereof. . . ." The majority opinion would seem to imply that this statute *compels* the granting of an issue in this case, whereas there must first be, of course, a party who desires to have an issue granted and is qualified or authorized to request it, and it is then, and then only, that the statute provides for the *procedure* governing the issuance of a precept.

While, as previously stated, we are not, in my opinion, concerned in any way in the present proceedings with the merit or lack of merit of the attack upon Mrs. Brindle's will, I cannot refrain, in passing, from pointing out that the majority opinion, while cumulating all the testimony in support of that attack, omits entirely to mention any of the evidence tending to establish the integrity of the will,—for example, that none of these disappointed cousins lives in Belleville where the testatrix lived all her life, some of them residing as far away as Kansas; that testatrix not only had no intimate relations with them, but, on the contrary, repeatedly and emphatically declared that "they never came to help me or do anything for me" and "they would never get a damn cent"; that on the other hand, the two persons whom she made her residuary legatees lived their whole lives with her in her own town; that Mr. Steffey had been intimately acquainted with her and her husband for 32 years; that her family and the family of Mrs. Zook had been intimate friends all her life, to such an extent indeed that, after the death of Mrs. Zook's mother,

68

Mrs. Zook being then but eight or ten years old, Mrs. Brindle became "like a second mother to her." I know of no law nor of any rule governing ordinary human relations which says that a person must bequeath her estate to distant relatives rather than to intimate lifetime friends and associates. In the present instance Mrs. Brindle took care, to the fullest extent and in the most sensible and practical way, of every possible need and interest of the person who was nearest and dearest to her, namely, her brother, and it was only after she had thus provided for him that she gave whatever might remain after his death to her two closest friends in the community in which she lived. I cannot see anything in such a will that is not wholly normal and natural, or that would be calculated to excite suspicion on the part of any fair-minded and disinterested person.

But let us turn now to the decisions in our own jurisdiction bearing upon the question here involved. The majority opinion chooses to ignore them because they refer to the election of a mentally incompetent husband and wife to take against the will of his or her spouse, and in such cases the integrity of the will itself is not under suspicion. This, of course, may be a distinction, but it is a distinction without a difference, for the two situations, from a legal standpoint, are not only analogous but identical. In both of them we have an incompetent person called upon to make a choice of conduct in regard to the repudiation of a will or part of it; in both of them that choice is to be made solely on the basis of expediency or personal welfare of the incompetent; in both of them, since the mental incompetent is unable to determine what is best for himself and he is the object of the court's solicitude and protection, the court, acting on his behalf, must make the election for him. Indeed, if any different rule whatever were to be established between the two cases there should be required greater caution on the part of the court in authorizing the guardian of a mentally incompetent heir to

attack the probate of a will than in authorizing the guardian of a mentally incompetent widow to elect to take against her husband's will, for the former case is bound to involve bitter, protracted, costly and, at best, doubtful litigation, whereas the latter calls merely for the exercise of an established, uncontestable legal right.

The authorities are clear as to the tests to be applied in the determination of the question as to whether the guardian of a mental incompetent should be authorized by the court to attack the integrity of a will.

In *Kennedy v. Johnston*, 65 Pa. 451, 455, the court said that "The choice thus presented by the law is one for a judicious consideration—one of judgment to be exercised upon a view of the circumstances." It was further stated that the right is personal, or, because of incompetency due to unsoundness of mind, to be exercised by the court which has the care of the incompetent's estate, and that (p. 456) the court would grant leave to elect to take against the will "only on due consideration of the advantages and disadvantages of the choice."

In *Re Bringhurst. Fidelity Trust Company's Appeal*, 250 Pa. 9, 95 A. 320, it was held that, since the demented person's share of the testator's estate under his will was amply sufficient properly to provide for her comfortable maintenance, and since the first consideration was the incompetent's personal welfare, leave would not be granted to take against the will even though such election would result in her obtaining a larger share; the fact that if such election were allowed certain adopted grandchildren of the widow would profit by inheriting from the incompetent was declared to be a matter which should not be taken into consideration at all.

In *Brooke's Estate*, 279 Pa. 341, 123 A. 786, it was similarly held that where the income of the incompetent, in this case a husband, was ample to supply all of his needs without considering the additional benefits derived from his wife's estate, his guardian would not be per-

mitted to elect to take against her will, it being again emphasized that other persons who would indirectly benefit from such election were not to be considered in determining what was for the best interests of the incompetent.

In *Stockton's Estate*, 311 Pa. 189, 166 A. 648, the same rule was applied and the same conclusion reached. The Court said that the question was one within the court's discretion, to be exercised judicially upon consideration of all the circumstances, and with a view primarily to the interests and welfare of the incompetent husband himself.

In *German's Case*, 318 Pa. 200, 178 A. 38, it was stated once again that the question was within the discretion of the court below as to what was best for the incompetent's welfare and interests. In this particular instance the court authorized an election against the will.

In the leading case of *Harris Estate*, 351 Pa. 368, 382, 41 A. 2d 715, 722, this Court, after repeating the now time-worn rule that the question for decision was whether there was an abuse of judicial discretion in the refusal of the court below to direct the guardian of an incompetent to reject the provision made for her under a will, pointed out (pp. 383, 384, A., p. 722) that "well defined principles have been laid down as guides for the exercise of its discretionary power." We said that "It is common knowledge that not every widow disregards her husband's last wishes for the disposition of his property merely because she would obtain a greater quantum of his estate by so doing; sentiment enters into such situations quite as much as considerations of material advantage, and, if she is reasonably provided for in her husband's will or her wants are otherwise adequately supplied, it does not follow, just because such provision may not be as much as she might elect, that she would file an election to take against the will. *Therefore, when the court acts on behalf of a mentally defective widow*

*it should not be controlled by mere mathematical calculations of the financial results that would accrue to her one way or the other.* Another principle frequently stated is that, while the court should base its decision on the consideration of all the circumstances . . ., *the welfare of the widow is the main object of such consideration, and therefore the interests of her creditors or heirs who might either benefit or suffer by the choice to be made are almost wholly immaterial in the determination of the question."* And we quoted with approval (p. 385, A., p. 723) the statement of the court below that *"The court cannot in this situation properly take that course which would create for the incompetent a large estate of which she could by no possibility have the present benefit in her lifetime, but which ultimately would go to her next of kin sometime in the distant future. The primary consideration is the current welfare of the incompetent herself, and the court's discretion in the matter must be so exercised as to serve that purpose."* In the concurring opinion filed by Chief Justice MAXEY (p. 390, A., p. 725) it was said: "That the widow's *kindred* would ultimately be enriched by permitting this widow's guardian to take against the husband's will was a consideration to which the court which had the guardian's request before it properly refused to give any weight. *With their interest the court had no concern."*

All the principles thus declared by our own Court are similarly proclaimed, and like decisions made, in numerous cases in other jurisdictions; as examples: *Van Steenwyck v. Washburn,* 59 Wis. 483, 17 N. W. 289; *State ex rel. Josephine L. Percy v. T. J. Hunt,* 88 Minn. 404, 93 N. W. 314; and *Estate of Melissa Connor,* 254 Mo. 65, 162 N. W. 252, 49 L. R. A. (n. s.) 1108.

The upshot, then, of these universally established rules is this,—that where, because of mental incompetency, a person is unable to determine whether or not to attack a will in whole or in part or whether or not

to elect to take against its provisions, the choice must be made by the court acting on his behalf; that in its decision of the question only the immediate interests of the incompetent, as ward of the court, are to be considered; that if there is already assured to him an income or principal sufficient for all his possible needs the question of further pecuniary advantage is one of no moment whatever; that no attention is to be paid to the interests of those who, upon his death, may have eventual rights of succession; that the court below is invested with discretion, and that any conclusion reached by it after consideration of all these proper factors is not to be set aside on appeal unless such discretion has been obviously abused.

Applying these principles to the present case it does not seem to me that any conclusion is tenable other than that it would be extremely disadvantageous to Frank Fox for his guardian to attack his sister's will. Even if such attempt were successful, he would, from every *practical* standpoint, be worse off than in taking what is given him under the will. Not only would the necessary expenses and legal fees greatly diminish the ultimate amount of the estate available for his use, but the transfer inheritance tax would be approximately $11,000 more on his share. On the other hand, he enjoys, under the will, the complete income of the estate and as much of the principal, if the income prove insufficient, as is necessary for his comfort and maintenance. What more could a person in his circumstances want or need? Why should a court, seeking only *his* best interests, plunge him into litigation, at best of doubtful outcome, merely in order to obtain for him additional property which, under no possible circumstances, could be of any actual benefit to him? He is 70 years of age, unmarried and without issue; he has been hopelessly deranged for upwards of 20 years; he is under the constant care of someone who must feed him and attend to his physical requirements; all the parties agree of record that he is

*hopelessly* and *permanently* demented and that his condition will tend to become progressively worse until his death. If his guardian were to be authorized to attack the will it might even be that during the long ensuing litigation the periodic payments of income so vital to him might be threatened, and it is at least doubtful whether he himself would survive the course of the contest through the trial and appellate courts. Under all such circumstances no court, if really acting for the best interests of its incompetent ward, should subject this old, helpless man to what, so far as he personally is concerned, would be foolhardy litigation.

Who are the persons who are attempting to benefit, and who alone could benefit, by such a contest? They are the cousins who are using this mentally deranged incompetent as a mere robot to pull their own chestnuts out of the testamentary fire. They themselves have no legal standing whatever to be the moving parties[3] and they are exploiting him solely for that purpose notwithstanding the bland statement in their brief that they "are upon the record only in protection of the interests of the incompetent". The fact is that, by its present decision, this Court is bypassing and disregarding the real interests and welfare of Frank Fox, its ward, and considering only these others who, under all the authorities, should not be the objects of its concern at all.

Because of the views I have thus expressed, and because of my understanding of the legal principles applicable to this situation, I must earnestly dissent from the reversal of the orders which the court below has entered.

MR. CHIEF JUSTICE MAXEY concurs in this dissenting opinion.

---

[3] Their interest, which may prove wholly illusory, is that, *if* Mrs. Brindle's will should be set aside, and *if* her mentally incompetent brother should not be able at any time hereafter to make a will, and *if* there is no such will already in existence made by him prior to his becoming mentally incompetent and bequeathing *his* estate to other persons, they *might* ultimately come into possession of any portion of the property left unconsumed at his death.