# Estate of DiCesare

*Karl L. Prior,* for petitioner.

*Salvatore LaRussa, Jr.* for respondents Mazzei and Squitieri.

*Jerome Balka,* for respondent Prudential Savings Bank.

O'KEEFE, *A.J.,* May 5, 2003—By decree dated 28 December 2001, the register of wills appointed petitioner, Theresa Owen, as the administratrix of the estate of

Carmen DiCesare (the decedent), who died intestate on 13 June 2001.

On 8 January 2002, Theresa Owen (petitioner or the estate) in the court of common pleas, orphans' court division filed a petition for citation to show cause why assets should not be turned over. On the same day, the petition was assigned to the Hon. Joseph D. O'Keefe, A.J. (the court). Respondents are: Prudential Savings Bank (the bank), a state chartered savings and loan association; Frances Mazzei, the manager of the bank's 19th and Snyder Avenue branch; and Lucia Squitieri, the assistant manager of the same branch.

On 22 February 2002, the bank filed its answer to the petition. On 7 March 2002, Mazzei and Squitieri, filed their answer to the petition as well as a cross-claim for contribution and indemnity against the bank.

The trial in this matter commenced on 4 November 2002, continued through 7 November 2002, and reconvened to hear final testimony on 9 and 28 January 2003, after which petitioner and respondents rested.

## FACTS

Carmen DiCesare was born on 24 January 1917. From 1917 until September 2000, decedent lived at 2023 South 18th Street in Philadelphia, Pennsylvania.[1] Decedent held

---

1. Before the events at issue, decedent:

• talked with his neighbor of 28 years, Angelina Destra, about his work and other matters, 11/4/02 N.T. 89-90-112;

• visited and talked about five to six times per week with his friend Albert Johnson, who lived one block from decedent, 11/4/02 N.T. 122-27 (affirming P-15);

• knew where and how his money was held;

• was tight with his money, 11/4/02 N.T. 116-17;

• maintained numerous savings and checking accounts at the bank and at Sharon Savings Bank, see *e.g.* P-21 to P-24; and

different accounts at both the bank and Sharon Savings Bank.[2] Before the onset of dementia, decedent visited Sharon Savings once a month, and visited the bank's Snyder Avenue branch once a week.[3]

The bank is a mutual savings and loan association.[4] Mazzei is the branch manager at the bank's Snyder Avenue office.[5] Squitieri is the assistant manager.[6] The Snyder Avenue branch is six blocks from the bank's headquarters, where the bank's president and CEO, Thomas Vento; CFO, Joseph Corrato; and vice president of branch operations, Maria Botta have offices.[7]

Occasionally, both Mazzei and Squitieri perform teller functions. When acting as tellers, they must comply with the bank's teller manual, P-19.[8] Mazzei and Squitieri also must follow the bank's employee manual, P-20. The bank prohibits tellers from handling transactions in their own accounts.[9]

Despite the fact that 70-75 percent of the Snyder Avenue branch's customers are senior citizens, the bank has

---

• until 1998, purchased certificates of deposit which he "rolled over" every 6 months. 11/6/02 N.T. (I) 103.

2. For example:

• from 1993 through 8 August 2000, decedent maintained a savings account at the bank in his name alone, and

• since 1997, decedent maintained a checking account at the bank in his name alone. 11/4/02 N.T. 51-52, 54-55; P-42; P-5.

3. 11/4/02 N.T. 43, 154.

4. 11/6/02 N.T. (I) 280. The bank is owned by its depositors who trust the bank's management to act in the depositors' best interests. 11/6/02 N.T. (I) 280.

5. 11/4/02 N.T. 34.

6. 11/4/02 N.T. 38-39.

7. 11/4/02 N.T. 34-35; 11/6/02 N.T. (I) 281-82.

8. 11/4/02 N.T. 36; 11/6/02 N.T. (II) 7; P-19.

9. 11/6/02 N.T. (II) 14.

not trained Mazzei, Squitieri, or any other employees on:

- interacting with senior citizens;
- recognizing signs of mental impairment;
- transacting business with persons whom they believe, or have reason to suspect, are mentally impaired;
- bank ethics; or
- recognizing and resolving potential conflicts of interest.[10]

As of 7 August 2000, the bank had no consistent, written, or distributed conflict of interest policy.[11] By the date of testimony, Mazzei admittedly still did not know whether the bank has a conflict-of-interest policy.[12]

The bank does not re-certify or test its employees on policies and procedures after their initial training.[13] Consequently, the bank has not tested Mazzei or Squitieri on policies or procedures since Mazzei began her employment with the bank in 1964, and Squitieri in 1987.[14]

As an adult, Mazzei's interactions with decedent resulted from her employment with the bank.[15] Mazzei did

---

10. 11/4/02 N.T. 35, 40, 42. In addition, neither the bank's teller manual, P-19, nor the employee manual addresses transactions with persons whom a teller knows to be, or suspects may be, mentally impaired. 11/4/02 N.T. 40-41; 11/6/02 N.T. (II) 8. Neither the teller manual nor the employee manual addresses bank employees being named as beneficiaries of, or receiving powers of attorney over, customer accounts. 11/6/02 N.T. (II) 13.

11. 11/6/02 N.T. (II) 10.

12. 11/4/02 N.T. 41-42.

13. 11/6/02 N.T. (I) 194-95; 11/6/02 N.T. (II) 31-33.

14. 11/4/02 N.T. 42; 11/6/02 N.T. (I) 195-96.

15. 11/4/02 N.T. 44.

not know decedent's nickname, nor did she ever visit decedent's home until the events at issue.[16]

Squitieri first met decedent in late 1998, solely as a result of her employment at the bank.[17] Decedent was then suffering from progressive irreversible dementia.

Neither Mazzei nor Squitieri socialized with decedent outside of the bank's Snyder Avenue branch.[18] Decedent never mentioned Mazzei or Squitieri to Albert Johnson, his friend of 65 years.[19]

From November 1997 through January 2000, Dr. Vincent Renzi treated decedent.[20] In January 1998, decedent complained to Dr. Renzi of forgetfulness, which decedent attributed to his prostatism medication, Flomax.[21] Dr. Renzi discontinued the Flomax, but decedent's cognitive deficits persisted.[22]

On 12 March 1998, Dr. Renzi prescribed Aricept for decedent.[23] The FDA had then only approved Aricept for treating Alzheimer's dementia.[24]

---

16. 11/4/02 N.T. 43,113.

17. 11/7/02 N.T. 35.

18. 11/4/02 N.T. 43-44; 11/7/02 N.T. 35.

19. 11/4/02 N.T. 125-27 (affirming P-15).

20. P-31; P-66 at 2; 11/6/02 N.T. (I) 53-54.

21. P-31 at 8; P-66 at 2; 11/5/02 N.T. (II) 72-73.

22. P-66 at 2; 11/5/02 N.T. (II) 73-74.

23. 11/5/02 N.T. (II) 75; P-31 at 7.

24. 11/5/02 N.T. (II) 74; 11/6/02 N.T. (I) 55-56. Persons with moderate stage dementia can:

• have trouble recognizing familiar faces and difficulty with the instrumental activities of daily living such as household management;

• have difficulty balancing a checkbook and taking medication on a consistent schedule, 11/5/02 N.T. (III) 50;

• lack insight into, and refuse treatment for, their mental impairment, 11/6/02 N.T. (I) 66;

On 8 December 1998, more than 21 months before the ITF account's creation, Dr. Renzi diagnosed decedent with "progressive dementia."[25] By the end of 1998, decedent began to visit the bank as many as four times per week.[26] During which visits, decedent allowed only Mazzei and Squitieri to conduct his transactions.[27]

On 19 January 1999, more than 20 months before the ITF account's creation, Dr. Renzi observed decedent as disheveled, unshaven, and with decreased attention to bathing.[28] Dr. Renzi gave decedent a Mini-Mental Status Examination (MMSE).[29] Decedent's score correlates

---

• recall some past events, but have difficulty recalling newly learned or complex information, 11/5/02 N.T. (III) 52;

• drastically change their behavioral patterns, 11/5/02 N.T. (II) 88; 11/6/02 N.T. (I) 68;

• have difficulty keeping track of their meals, suffer from poor nutrition and weight loss, 11/5/02 N.T. (II) 83-84;

• become inattentive to personal care and hygiene, 11/5/02 N.T. (III) 11; and suffer from paranoia, particularly as to money. 11/5/02 N.T. (II) 86.

By fall 1998, decedent suffered many of these symptoms. For example:

• in September 1998, Mr. Johnson observed that decedent began to lose his faculties and to act very strangely. 11/4/02 N.T. 112-13, 122, 124, 127, Mr. Johnson's observations of decedent's behavioral changes date to at least September 1998; and

• on 8 December 1998, Dr. Renzi observed that decedent had progressive difficulty remembering why he was taking certain medications. P-31 at 6.

25. P-31 at 6; P-66 at 2; 11/5/02 N.T. (II) 102-103.

26. 11/4/02 N.T. 43.

27. 11/4/02 N.T. 44-45.

28. P-31 at 3; P-66 at 2; 11/5/02 N.T. (II) 76-77. Dr. Renzi had not before this date mentioned decedent's appearance. 11/5/02 N.T. (II) 77; see also, P-31.

29. The MMSE is a standard test used in clinical practice, and in research addressing cognitive disorders in older adults. 11/5/02 N.T.

with the "mild" stage of dementia, and was six points below average for his age.[30]

On 24 September, Dr. Renzi spoke with decedent about the MMSE score and decedent's progressive forgetfulness.[31] Dr. Renzi offered to prescribe Aricept again for decedent, who had discontinued its use. Decedent refused the medication.[32]

On 6 January 2000, eight months before the ITF account's creation, Dr. Renzi's physician's assistant (PA) observed decedent to be a "poor historian," with "speech tangential @ times," and "distractable [sic]."[33] The PA noted that decedent continued to pay his monthly bills.[34]

In spring 2000, decedent asked Mrs. Destra if she had seen "people going in and out of his house, stealing his money."[35] Decedent now visited Sharon Savings every day, instead of just once per month.[36] Sharon Savings Assistant Manager Roxanne Rivera became concerned about decedent's mental well-being.[37] Sharon Savings

---

(II) 69. The test grades on a scale of 1 through 30. The average MMSE score for an 82-year-old man is 28. 11/6/02 N.T. (I) 64. Respondent's expert, Dr. Marc Rothman, testified that the average score for an 85-year-old would be 25, and that one could add 1 to 2 points per year for each year of age below 85. 11/6/02 N.T. (I) 64. An MMSE score below 25 indicates significant cognitive impairment. 11/5/02 N.T. (II) 81-82. Decedent, who was then 82-years-old, scored 22.

30. P-31 at 3; P-66 at 2; 11/5/02 N.T. (II) 81-82; 11/6/02 N.T. (I) 64, 66.

31. P-31 at 2.

32. P-31 at 2; 11/5/02 N.T. (II) 83.

33. P-31 at 5.

34. 11/4/02 N.T. 46-49, 51.

35. 11/4/02 N.T. 90.

36. 11/4/02 N.T. 154-55.

37. 11/4/02 N.T. 157. She observed that

• decedent was "not his normal self;"

employees now spent upwards of an hour explaining decedent's finances to him, and assuring him that no one was taking his money.[38]

More than once around this time, decedent locked himself out of his house. In one such instance, Mrs. Destra told decedent that she had telephoned a locksmith to assist him. After a short wait, decedent stated, "You people didn't call anybody," and walked away.[39]

During this time, decedent lost his passbook for the bank account number 17699, an account which he had held since 1993.[40] The bank's policy requires, and each page of the bank's passbooks states that a customer may not conduct transactions in a passbook savings account without the passbook.[41] Nonetheless, Mazzei and Squitieri violated the bank's policy by repeatedly allowing decedent to withdraw funds without his passbook.[42]

By July 2000, decedent stopped visiting Mr. Johnson.[43] Previously, decedent had visited Mr. Johnson five to six times per week.[44] By August 2000, decedent:

---

- decedent "wasn't there . . . his mental capacity was gone;" and
- decedent's physical appearance changed. 11/4/02 N.T. 157-59, 165.

For example, decedent would enter Sharon Savings, sit silently, leave for 10 minutes, return, and resume sitting silently. In June 2000, this behavior occurred four times in one week. 11/4/02 N.T. 156. Rivera was able to place this week at a month or two before decedent closed his Sharon Savings accounts. 11/4/02 N.T. 156. Decedent closed his Sharon Savings accounts on 8 August and 9 August 2000. 11/4/02 N.T. 155; P-21; P-22; P-23.

38. 11/4/02 N.T. 155.
39. 11/4/02 N.T. 92-93.
40. 11/4/02 N.T. 59-60; P-5.
41. 11/4/02 N.T. 56, 60; P-11.
42. 11/4/02 N.T. 60-61.
43. 11/4/02 N.T. 122, 143.
44. 11/4/02 N.T. 122-27.

• had diminished cognitive abilities compared to other persons;

• would be expected to have an MMSE score of 18 or 19, nine to 10 points below the average score for his age; and

• would have been subject to the influence and persuasion of persons whom he trusted.[45]

Most laypersons, particularly those who had observed decedent over an extended period of time, by then would have noticed distinct changes in decedent's behavior and mentation leading them to question decedent's mental well-being.[46]

On 8 August 2000, decedent allegedly stated that he wanted to switch his social security direct deposit from Sharon Savings to the bank.[47] Mazzei told decedent that she could not arrange direct deposit on account 17699 because decedent had lost his passbook. She told decedent that to set-up direct deposit, decedent needed to open a new account.[48] Yet, to establish direct deposit, a bank requires only the account number and bank routing number.[49]

Rather than opening a new account of the same type as account 17699, Mazzei and Squitieri opened account 31273 in trust for (ITF) themselves.[50] Despite decedent's already having an ITF account with Sharon Savings, as well as several other accounts between the two banks,

---

45. 11/5/02 N.T. (II) 82,104-105; 11/5/02 N.T. (III) 43-44.
46. 11/5/02 N.T. (II) 106.
47. 11/4/02 N.T. 62.
48. 11/4/02 N.T. 62-63.
49. 11/4/02 N.T. 62-63; 11/5/02 N.T. (I) 70-71; P-26.
50. 11/4/02 N.T. 64.

Mazzei had to explain to decedent what an ITF account was and how it worked.[51]

Mazzei telephoned Vento for permission to open the account.[52] A conference ensued between Mazzei, Vento and Corrato, who was in Vento's office.[53] Vento suggested that decedent obtain an attorney to draft a will.[54] Mazzei did not relay this advice to decedent.[55] Instead, Mazzei told Vento that decedent did not want an attorney.[56] Vento did not verify this representation.[57] Neither Corrato nor Botta offered to, or did, meet with decedent.[58]

51. 11/4/02 N.T. 64-70, 160-61; P-21; P-45; P-46.

52. 11/4/02 N.T. 70.

53. 11/6/02 N.T. (II) 35-38, 50-51. During the call, Mazzei said that

• decedent allegedly wanted to make her and Squitieri beneficiaries of an ITF account;

• the account contained over $200,000;

• she had been helping decedent with his financial affairs;

• decedent had a niece living in New Jersey; and decedent visited the Snyder Avenue branch everyday. 11/4/02 N.T. 71, 76; 11/6/02 N.T. (II) 39-42.

54. 11/6/02 N.T. (II) 42.

55. 11/6/02 N.T. (I) 199-203; 11/6/02 N.T. (II) 42-43. See 11/4/02 N.T. 72-73; 11/6/02 N.T. (I) 199-200; contrast 11/6/02 N.T. (I) 200-201; 11/6/02 N.T. (I) 199-203; 11/6/02 N.T. (II) 42-43. See 11/4/02 N.T. 72-73; 11/6/02 N.T. (I) 199-200; contrast 11/6/02 N.T. (I) 200-201.

56. 11/6/02 N.T. (II) 43.

57. 11/6/02 N.T. (II) 43. Vento also did not:

• ask decedent's age, although he assumed decedent was over 65, 11/4/02 N.T. 76; 11/6/02 N.T. (II) 48;

• offer to meet with decedent or suggest that another bank employee such as Corrato or Botta meet with decedent or witness the transaction, even though "when the need arises" Vento often interacts with customers, 11/4/02 N.T. 75-76; 11/6/02 N.T. (II) 51;

• suggest that Mazzei delay the transaction to determine whether decedent would still want to create the account in a day or two, or to allow the bank's counsel time to meet with decedent, 11/4/02 N.T. 77; 11/6/02 N.T. (II) 47, 54;

304

Vento suggested that Mazzei speak with the bank's counsel.[59] Vento hoped that counsel would convince decedent to have drafted a will.[60] Although the bank's counsel is available to the bank on an "as-needed basis," there was no follow-up to Vento's hopes for decedent.[61] Nonetheless, Vento authorized Mazzei and Squitieri to open the ITF despite his awareness that they should not have personally handled the transaction.[62]

The court counts at least six documents created upon opening, or related to, the ITF account that violated the bank's policy and procedure, as follows:

First, the bank's customer account agreement, P-25, contains general terms and conditions governing all of the bank's accounts.[63] The agreement refers customers to an account card that contains the specific terms applicable to the account being opened.[64]

With ITF accounts, the bank requires the customer to sign both sides of an account card, P-8. One side of P-8 is entitled "Trust account," while the other side is entitled "Discretionary revocable trust agreement." [65] The discretionary revocable trust agreement contains the ITF

---

• suggest that if decedent were intent upon leaving funds to Mazzei or Squitieri, that he do so at another bank, 11/4/02 N.T. 77; or

• suggest that Carmen travel six blocks to the main office to open the account. 11/6/02 N.T. (II) 63-64.

58. 11/4/02 N.T. 79-80.

59. 11/4/02 N.T. 74-75.

60. 11/6/02 N.T. (II) 44-45.

61. 11/64/02 N.T. 75; 11/6/02 N.T. (II) 45-46.

62. 11/4/02 N.T. 77; 11/6/02 N.T. (II) 52-53.

63. 11/6/02 N.T. (I) 98-100.

64. See *e.g.* P-2; P-5.

65. See P-8.

account's terms and conditions.[66] Although decedent signed the account card for account 31273, P-8, he did not read it.[67]

Second, either Mazzei or Squitieri created a passbook for the ITF account, P-11.[68] They kept the passbook at the Snyder branch because they thought decedent would lose it.[69] P-11 bears the ITF account number on every page, and contains decedent's signature.[70]

Either Mazzei or Squitieri also created a duplicate passbook.[71] The duplicate passbook did not bear an account number. Mazzei and Squitieri gave decedent the duplicate passbook, but decedent could not use the duplicate passbook to deposit or to withdraw funds from the ITF account, or to enter another of the bank's branches and change the ITF designations.[72] The duplicate passbook violated the bank's policy.[73]

Third, at Mazzei's direction, decedent signed a document which Mazzei typed, P-7, as follows:

"I [decedent] on 8-8-00 open new account #01-90-31273. I wish to put the account in trust to Frances Mazzei and Lucia Squiieri [sic]." [74]

P-7 is the only plain-English description of what decedent was doing on 8 August 2000.[75] P-7 clearly states

66. 11/6/02 N.T. (I) 101-103; P-3; P-8.
67. 11/4/02 N.T. 83; 11/6/02 N.T. (I) 100.
68. 11/4/02 N.T. 199; P-11.
69. 11/4/02 N.T. 203-206.
70. The signature is visible under ultra-violet light. 11/4/02 N.T. 201-202.
71. See P-28 at EST 457.
72. 11/4/02 N.T. 209.
73. 11/4/02 N.T. 208; 11/6/02 N.T. (II) 58-59.
74. 11/4/02 N.T. 196-97; P-7.
75. 11/4/02 N.T. 198.

decedent's understanding that he was putting his "account in trust *to,*" and not leaving funds in trust "*for,*" Mazzei and Squitieri.[76]

Fourth, Mazzei told decedent that he needed to create a new account to directly deposit his social security check. Yet, Mazzei could not close and move account 17699 funds into the ITF account without a passbook. Mazzei and Squitieri, thereafter, completed a lost passbook affidavit for account 17699.[77]

P-9a contains a box for notary attestation.[78] The bank's policy requires such notarization.[79] Mazzei and Squitieri did not comply with this bank policy, and consequently, a third-party notary did not witness the transaction.[80]

Fifth, for all new accounts, the bank requires customers to read and sign a customer account agreement.[81] Normally, the bank obtains customer information, enters that information into a computer, and then prints a customer account agreement containing the customer information. The customer then signs this pre-printed document.[82]

The customer account agreement for the ITF account, P-25, is handwritten, not typed.[83] Squitieri hand-wrote all information appearing on P-25.[84]

---

76. 11/4/02 N.T. 197-98; P-7.

77. P-9 at 3; P-9a.

78. 11/4/02 N.T. 81; P-9a.

79. 11/4/02 N.T. 81; P-9 at 3.

80. 11/4/02 N.T. 82.

81. 11/6/02 N.T. (I) 98-99; see *e.g.* P-2, P-5, P-42, and P-43.

82. 11/4/02 N.T. 52-53, 84; 11/6/02 N.T. (I) 99; see *e.g.* P-5, P-42, P-43.

83. 11/4/02 N.T. 84; P-25.

84. 11/4/02 N.T. 85; 11/7/02 N.T. 38-39.

Sixth, on 9 August 2002, Squitieri completed and typed P-26, a form authorizing direct deposit of decedent's monthly social security check, which previously had been deposited into his Sharon Savings account, into the ITF account, as opposed to decedent's checking account.[85] The ITF account then grew each month by $709, the amount of decedent's social security deposit.[86]

The ITF account initially contained $247,165.34 as transferred from account 17699.[87] Sometime on 8 August 2000, after the ITF account was opened, $311,263.24 was withdrawn via check from Sharon Savings and deposited into the ITF account.[88] The ITF account then contained roughly $558,426.[89]

On 9 August 2000, $122,026.05 was withdrawn via check from Sharon Savings and deposited into the ITF account.[90] The account balance was $680,424.63.[91] Mazzei wrote the ITF account balance in large black marker numbers on a piece of paper so that decedent would know his account balance.[92]

In violation of bank policy, Mazzei or Squitieri accepted the checks from Sharon Savings without decedent's endorsement.[93] Mazzei informed Vento that

85. 11/4/02 N.T. 230-31; 11/7/02 N.T. 41-42; P-26.

86. 11/6/02 N.T. (I) 199; see also, P-11.

87. See P-9, P-10, P-11 at PR000063 (line 1).

88. P-13, P-14, P-11 at PR000063 (line 2).

89. P-11 at PR000063 (line 2).

90. P-12, P-14, P-11 at PR000063 (line 4).

91. P-11 at PR000063 (line 4).

92. 11/6/02 N.T. (I) 172, 205-206.

93. 11/4/02 N.T. 222.

the account had swelled by several hundred thousand dollars.[94] Vento still did not speak with decedent.[95]

In early September 2000, a police officer brought decedent to Mr. Johnson's home. The police officer said that decedent had been wandering, and had locked himself out of his home. Mr. Johnson helped decedent re-enter his home. Later that day, decedent again locked himself out of his home and returned to Mr. Johnson's home.[96]

On Monday, 18 September 2000, decedent was found wandering and in a confused state within St. Agnes Hospital.[97] He was admitted to St. Agnes with a diagnosis of dementia.[98] This was the fourth time that week that decedent had visited St. Agnes.[99]

On 19 September 2000, decedent left St. Agnes Hospital against medical advice and unnoticed by the staff.[100] Decedent now suffered from a delirium superimposed upon pre-existing dementia.[101]

---

94. 11/4/02 N.T. 79, 224.

95. On 9 August 2000, Mazzei informed the bank's counsel that the ITF account had been opened. The bank's counsel did not:
- ask or offer to meet with decedent;
- ask to see any account opening documents; or
- speak with Squitieri. 11/4/02 N.T. 226-28; 11/7/02 N.T. 40.

Before this litigation, no one from the bank reviewed Mazzei's file for decedent. 11/4/02 N.T. 228-29.

96. 11/4/02 N.T. 124-25.

97. P-27 at EST 330.

98. P-27 at EST 321.

99. P-27 at EST 332.

100. P-27 at EST 332.

101. 11/5/02 N.T. (II) 93.

On Thursday, 21 September 2000, decedent withdrew $40 from the ITF account.[102] Decedent's delirium superimposed upon a dementia would have been apparent to any lay observer who saw him that day, including Mazzei, with whom he spoke.[103] Decedent told Mazzei that he had been treated at St. Agnes Hospital, but that he did not know what he had been treated for, or why he went to St. Agnes.[104]

On Friday, 22 September 2000, decedent wandered into the Cambridge Retirement Center. He presented as disheveled, dirty, unshaven, confused, disoriented, and with dirty clothing.[105] Decedent told Cambridge administrator Florence Curley that he needed a place to stay; that people were stealing from him and were coming into his home at all hours; and that his neighbors were coming through his walls.[106] Decedent asked to stay at Cambridge with assurances that he could afford the facility. He presented Mrs. Curley with the duplicate passbook which reflected a $681,000 balance as of 15 September 2000.[107] He asked Mrs. Curley not to cheat him.[108]

Mrs. Curley photocopied the duplicate passbook, and kept a copy in Cambridge's records.[109] Mrs. Curley arranged for decedent to stay in a room, and Cambridge placed decedent under 24-hour surveillance.[110]

---

102. 11/4/02 N.T. 237-38.
103. 11/6/02 N.T. (I) 50, 52.
104. 11/4/02 N.T. 232-33.
105. 11/5/02 N.T. (II) 50-52, 55; P-28 at EST 460.
106. 11/5/02 N.T. (II) 6, 12-13, 50-52.
107. 11/5/02 N.T. (II) 6-7, 10.
108. 11/5/02 N.T. (II) 6-7, 10.
109. 11/5/02 N.T. (II) 6; P-28 at EST 457.
110. 11/5/02 N.T. (II) 14, 53.

On or about 23 September 2000, decedent left Cambridge.[111] Mrs. Curley and her son went to decedent's home, where they found him attempting to enter through a window.[112] Mrs. Curley and her son helped decedent enter his home. The home smelled of urine, and unopened mail was strewn about the house.[113] While Mrs. Curley was assisting decedent, Mr. Johnson arrived. Decedent spoke with Mr. Johnson, who convinced decedent to let Mrs. Curley care for him.[114]

Upon decedent's return to Cambridge, a doctor told Mrs. Curley to contact Roxborough Hospital about decedent.[115] She subsequently arranged for decedent to travel to Roxborough Hospital.[116] Thereafter, Roxborough transferred decedent to Friends Hospital's Crisis Response Center (CRC).[117] A Friends Hospital CT scan of decedent's head showed atrophy with enlarged sulci.[118]

---

111. 11/5/02 N.T. (II) 14-15.

112. 11/5/02 N.T. (II) 16-18.

113. 11/5/02 N.T. (II) 16-18, 40-41.

114. 11/4/02 N.T. 125, 127-28; 11/5/02 N.T. (II) 16, 42.

115. 11/5/02 N.T. (II) 19.

116. 11/5/02 N.T. (II) 19.

117. While at the CRC, decedent:

• was disoriented;

• was gravely disabled and unable to care for himself;

• wandered into other patients' rooms;

• urinated in one of the rooms;

• could not sustain appropriate conversation;

• did not know the year or state;

• appeared consumed by preoccupations; and

• scored 2 out of 30 on an MMSE. P-29 at EST 9-11.

Friends Hospital involuntarily committed decedent. P-29 at EST 7, 59. Friends Hospital doctors then treated decedent with antibiotics for a urinary tract infection. P-29 at EST 59-60.

118. Widened or enlarged sulci indicate a neuroma cell loss in the brain. 11/5/02 N.T. (II) 96-97.

On 29 September 2000, Friends Hospital transferred decedent to Kirkbride Center.[119] For six weeks, Kirkbride treated decedent with antibiotics.[120] Kirkbride also prescribed Exelon, a drug used to treat Alzheimer's.[121] Although decedent's urinary tract infection resolved, his memory was only fair and he required supervised living.[122] His diagnosis upon discharge from Kirkbride was "dementia with delusions." [123]

From 21 September 2000 through 16 November 2000, while the above was taking place, Mazzei and Squitieri neither saw decedent nor knew where he was.[124] They continued to hold his ITF passbook.

The bank's policy prohibits transactions in an ITF account unless the customer is physically present or specifically requests a transaction in his absence. In addition, Mazzei testified that she personally does not update passbooks for interest.[125] Nonetheless, in decedent's ab-

---

119. Decedent's diagnosis upon discharge from Friends Hospital included "Dementia not otherwise specified with agitation and psychosis." Decedent's condition upon discharge was "Still confused and disoriented secondary to dementia." P-29 at EST 60.

Upon admission to Kirkbride, decedent

• was found to be in need of emergency in-patient psychiatric hospitalization;

• told Kirkbride personnel that "people want me dead;" and

• stated, "It's getting harder and harder, I keep repeating things in my head." P-30 at EST 93.

120. P-30 at EST 93-94; 11/5/02 N.T. (II) 99.

121. 11/5/02 N.T. (II) 99.

122. 11/5/02 N.T. (II) 99.

123. P-30 at EST 93.

124. 11/4/02 N.T. 236-37.

125. 11/4/02 N.T. 238-41.

sence Mazzei recorded numerous transactions in the ITF account.[126]

On 15 November 2000, Mazzei, who had not seen decedent in almost two months, asked several police officers then conducting business at the bank to help locate decedent.[127] A bank customer, John Palmieri, saw Mazzei talking to the police officers and offered his assistance. Within a day, Mr. Palmieri learned that decedent was at Kirkbride.[128]

On 16 November 2000, Kirkbride transferred decedent to Cambridge.[129] In Kirkbride's "Continuing care/ discharge planning" document, Dr. Mark Novitsky reflects an Axis I diagnosis of "Dementia = Delusion."[130] The problem areas marked for continuing care are "Psychosis."[131]

Mrs. Curley completed a Resident/Profile transfer sheet reflecting that "resident at admission has private duty home aide—24 x 7."[132] Decedent tried three times to sign Cambridge's admission agreement for personal care homes.[133]

On 16 November 2000, Mr. Palmieri, Squitieri and Mazzei visited decedent at Cambridge. Decedent did not know where he was.[134] He looked like a "street person."[135]

---

126. 11/6/02 N.T. (I) 105-106.
127. 11/4/02 N.T. 245-46.
128. 11/4/02 N.T. 244, 246.
129. P-28 at EST 445.
130. P-28 at EST 471.
131. P-28 at EST 472.
132. 11/5/02 N.T. (II) 24-25; P-28 at EST 445.
133. 11/5/02 N.T. (II) 24-25; P-28 at EST 452.
134. 11/4/02 N.T. 247-49; 11/6/02 N.T. (I) 226.
135. 11/6/02 N.T. (I) 226.

On 17 November 2000, Mazzei helped decedent withdraw $11,860 to pay Cambridge. Mazzei and Mr. Palmieri witnessed the withdrawal slip.[136]

Sometime before 6 December 2000, Mr. Palmieri involved himself in decedent's affairs. Mr. Palmieri asked decedent if he had a doctor, and decedent said that he did not.[137] On 6 December 2000, Palmieri, his counsel, and Mazzei took decedent to decedent's 18th Street home.[138] Decedent's home had not been cleaned, mail and trash were piled up, and unsanitary and unhealthy conditions existed.[139] Mr. Palmieri found unpaid bills dating to at least August 2000.[140]

On 7 December 2000, Kirkbride re-admitted decedent for emergency psychiatric care.[141] On 19 December 2000, Dr. Julius Mingroni examined decedent and found him to be "totally incompetent" and "unable to take care of his own personal needs and assets, as well as any personal monetary obligations." [142] On 3 January 2001, Dr. Novitsky told Mr. Palmieri that decedent was suffering from Alzheimer's disease.[143]

On 19 January 2001, Mr. Palmieri petitioned the court for appointment as decedent's guardian. Mr. Palmieri represented that decedent was "totally unable to manage

---

136. 11/6/02 N.T. (I) 110; P-32.

137. 11/6/02 N.T. (I) 229.

138. While at his home, decedent was disoriented; could not locate his house keys; and did not recognize his lifelong home. 11/6/02 N.T. (I) 219-21.

139. 11/6/02 N.T. (I) 219.

140. 11/6/02 N.T. (I) 211.

141. P-30 at EST 97.

142. P-35 at JP00597; see also, 11/6/02 N.T. (I) 229.

143. 11/6/02 N.T. (I) 247; P-72.

his financial affairs, property and business, or to make and communicate responsible decisions relating thereto, including the ability to communicate his need for assistance in these areas." [144]

On 8 February 2001, Kirkbride transferred decedent to Methodist Nursing Home. Dr. Novitsky noted "[Decedent's] memory is still poor, but as part of a dementing process, I do not expect this to resolve." [145]

The court held a guardianship hearing on 7 March 2001. Decedent who was then 84 years old testified that he was 55 years old, and that he did not know where he was. [146] By order dated 9 March 2001, the court adjudicated decedent incompetent.

On 13 June 2001, decedent died. Six days hence, Mazzei and Squitieri received $698,566.72 from the ITF account. [147] As the bank's policy requires management approval of any withdrawal, whether by check or cash, of over $1,000 and as Mazzei and Squitieri cannot conduct transactions in their own accounts, Botta came to the Snyder Avenue branch to approve and to conduct the transaction. [148] Mazzei and Squitieri deposited the funds with the bank into account #4964, held jointly in their names. [149].

The bank's policy prohibited Mazzei or Squitieri from conducting transactions in account #4964. [150] Despite this

144. P-35.

145. P-30 at EST 99.

146. P-36 at 33.

147. 11/4/02 N.T. 252; 11/7/02 N.T. 42.

148. 11/4/02 N.T. 253-54; 11/6/02 N.T. (I) 107; P-19 at PR000025, ¶5.

149. 11/4/02 N.T. 254; 11/7/02 N.T. 42; P-69 (source P-53).

150. 11/4/02 N.T. 253-54; 11/6/02 N.T. (II) 16.

prohibition, over the next three months, Mazzei and Squitieri used at least eight separate accounts to move money within, and eventually out of the bank.[151]

To circumvent the bank's policies, Mazzei approved and conducted Squitieri's transfers.[152] Squitieri, in turn, approved and conducted Mazzei's transfers.[153] Mazzei and Squitieri's quid pro quo violated the intent of the bank's prohibition on employees handling transactions in their own accounts.[154] Someone other than Mazzei or Squitieri should have conducted these transactions.[155]

Sometime before 24 September 2001, Mazzei learned that decedent's relatives had contacted Mr. Palmieri.[156] Approximately $408,000 of the funds originally in decedent's ITF account then remained in the bank in various accounts subject to the design of Mazzei and Squitieri.[157]

During the two days after being informed that decedent's heirs were represented by counsel, Mazzei and Squitieri removed the remaining $408,000 from the bank.[158] Mazzei and Squitieri should have obtained Botta's approval for each withdrawal.[159] Instead, Mazzei

151. P-69 reflects these transactions, which were admitted to at 11/4/02 N.T. 256-70, and 11/7/02 N.T. 42. Each such transfer implicated the bank's prohibition against conducting transactions in one's own accounts, and the bank's requirement that a manager approve all withdrawals over $1,000.

152. 11/4/02 N.T. 269-70.

153. 11/4/02 N.T. 266-70.

154. 11/6/02 N.T. (II) 17-18, 20, 22-23.

155. 11/6/02 N.T. (II) 23.

156. 11/4/02 N.T. 270-71; 11/6/02 N.T. (I) 111.

157. See P-69.

158. Those subsequent withdrawals, reflected in P-69 and admitted to at 11/4/02 N.T. 271-75, 11/7/02 N.T. 42, occurred via cash or check. Each withdrawal violated the bank's policy.

159. 11/6/02 N.T. (II) 30, 65-66.

counter-signed the checks issued to Squitieri, and Squitieri counter-signed the checks issued to Mazzei.[160]

Mazzei moved funds which she withdrew into a Police Fire Credit Union account held with her husband.[161] Mazzei's husband then systematically wrote checks averaging $9,000 to various of Mazzei's friends and relatives.[162] At least six such checks were for exactly $9,000.[163] Mazzei and Squitieri both have used funds which originated from decedent's ITF account to pay their counsel in the present matter.[164]

## LEGAL ANALYSIS

The estate seeks the turnover of ITF account proceeds. The estate clearly and convincingly has proven that Mazzei and Squitieri both directly and indirectly unduly influenced decedent to open the account, and to name them as beneficiaries of the account. The estate has proven by a preponderance of evidence that the bank must answer for its employees' actions under the respondeat superior doctrine. Moreover, the bank must account for negligently supervising Mazzei's and Squitieri's opening of the ITF account, and ultimate asset dissipation.

---

160. 11/6/02 N.T. (II) 74-75.

161. 11/6/02 N.T. 111.

162. 11/6/02 N.T. (I) 1.12-116; P-62. The checks ranged from $4,000 credit card fees to $40,000 paid to Mazzei's son-in-law, Charles Katze. 11/6/02 N.T. (I) 114; P-62.

163. See P-62.

164. 11/6/02 N.T. (I) 116-19; P-62 at MS-106.

## I. *The Estate Clearly and Convincingly Proved Both Direct and Indirect Undue Influence*

### A. The Estate Has Proven Indirect Undue Influence

In *Estate of Clark*,[165] the Supreme Court created a three-part test for establishing proof of indirect undue influence, the satisfaction of which test creates a presumption of undue influence in the respondent. The presumption arises when, as in the present matter, the estate shows: (1) that respondents were in a "confidential relationship" with decedent; (2) decedent had a "weakened intellect" when the account in question was opened; and (3) that respondents received a "substantial benefit" by their actions. The estate has met its burden under the *Clark* test, as follows:

### (1) *Testimony by the treating physician, lay witness, and expert witness proved "weakened intellect"*

In *Paolini Will*,[166] Judge Taxis defined weakened intellect as:

"A mind which, in all the circumstances of a particular situation, is inferior to normal minds in reasoning, power, factual knowledge, freedom of thought and decision, and other characteristics of a fully competent mentality. It should be viewed essentially as a relative state as the term is applied to *cases of undue influence,* as these cases always involve the effect of one intellect upon another; *if the intellect of the testator is substantially*

---

165. 461 Pa. 52, 334 A.2d 628 (1975).
166. 13 Fiduc. Rep. 2d 185, 187-88 (O.C. Montg. 1993). (emphasis added)

*impaired in comparison to that of the proponent or beneficiary it must be regarded as weakened* since there could be no equal dealings between the two parties."

In the present case the treating physician, eyewitness observations, and expert opinion[167] clearly and convincingly establish that decedent suffered from a weakened intellect.

At least four physicians who examined decedent in the last three years of his life diagnosed him with chronic irreversible dementia. Decedent's primary physician, Dr. Vincent Renzi, unofficially[168] diagnosed decedent with dementia in March of 1998, more than 27 months before the ITF was created.[169] Subsequently, Dr. Renzi officially diagnosed dementia in December 1998, more than 21 months before the ITF's creation.[170] Additionally, Dr. Joseph Horgan of St. Agnes Hospital diagnosed decedent with dementia; Dr. Ramesh Eluri of Friends Hospital diagnosed decedent with dementia with agitation and psychosis;[171] and Dr. Mark Novitsky diagnosed decedent as suffering from dementia with delusions.[172] These diagnoses clearly and convincingly establish weakened intellect.[173]

---

167. Respondents' first medical expert.

168. The court interprets this "unofficial" diagnosis as a consequence of Dr. Renzi prescribing Aricept to decedent at a time when Aricept was approved by the F.D.A. *only* for the treatment of dementia.

169. 11/5/02 N.T.(II) 75.

170. P-31 at 6-7.

171. P-29 at EST 59-61.

172. P-30 at EST 93.

173. *Stearnes Will,* 9 Fiduc. Rep. 2d 100 (O.C. Montg. 1989) (nursing home records written by disinterested parties and confirmed by testimony "overwhelming evidence" of weakened intellect); *Volkhardt*

Further, given the similarities of circumstance under which decedent interacted with Roxanne Rivera, the assistant manager of Sharon Savings, and with Mazzei and Squitieri at the bank, the court places significant weight upon the non-medical testimony of Ms. Rivera. Like Mazzei, Ms. Rivera had known decedent before his mental difficulties openly manifested themselves.[174] From 1997 through the beginning of 2000, Ms. Rivera observed decedent during his monthly visits to Sharon Savings. Ms. Rivera observed that during the spring of 2000, decedent was noticeably not quite himself. Ms. Rivera detailed decedent's erratic behavior, including: uncharacteristically visiting Sharon Savings nearly every day; uncharacteristically requiring significant time to have his finances explained to him; and a distinct change in his physical appearance, amongst others.[175] These statements powerfully evidence weakened intellect and the medical records and expert testimony corroborate their accuracy.[176]

---

*Estate,* 8 Fiduc. Rep. 2d 124, 134 (O.C. Phila. 1987) (conclusion of internist/gerontologist who examined decedent within four months of execution that decedent suffered organic brain syndrome "clearly demonstrated that decedent was of weakened intellect").

174. 11/4/02 N.T. 154.

175. 11/4/02 N.T 154-65. Additionally, decedent's long-time friend, Albert Johnson, also testified to drastic changes stating that, "[Decedent] started to lose his faculties and really act strange two or three years before he went into Cambridge home," *i.e.* roughly 1997 or 1998. 11/4/02 N.T 124, 127. Additionally, decedent's neighbor, Angelina Destra, also testified to decedent's paranoia and antisocial behavior beginning in March 1999. 11/4/02 N.T. 90.

176. For example, Mr. Johnson's estimate that decedent started to lose his faculties in or around 1998 comports with Dr. Renzi's March 1998 Aricept prescription and December 1998 dementia diagnosis. Similarly, Ms. Rivera's observations correspond directly with the Janu-

The estate presented Dr. Joel Streim's expert testimony and introduced his expert report.[177] In summary, Dr. Streim concluded that:[178]

• decedent was suffering from progressive irreversible dementia;

• decedent's progressive dementia was clinically apparent in 1998;

• decedent's dementia had progressed to the mild stage by January 1999;

• decedent's dementia worsened throughout 2000;

• in August 2000, decedent would have been vulnerable to undue influence or persuasion by people in whom he trusted;

• by August 2000, decedent would have had difficulty with previously familiar transactions;

• by August 2000, decedent's intellect would have been weakened;

• in August 2000, decedent would have been vulnerable to elder abuse; and

• by August 2000, decedent's dementia would have manifested enough symptoms that most laypersons, especially those who saw him over a period of months or knew him over an extended period of time would have been able to observe changes in his behavior.

The court finds that no credible expert or lay witness has contradicted Dr. Steim.[179]

---

ary 2000 physician assistant observations that decedent was unable to take care of himself.

177. See P-65, P-66; 11/5/02 N.T. (II) 66-108; 11/5/02 (II) 1-85.

178. 11/5/02 N.T. (II) 102-106.

179. On the contrary, respondents' first medical expert, Dr. Marc Rothman agreed with Dr. Streim's conclusions that decedent suffered

## (2) *The estate clearly and convincingly has proven confidential relationship*

A confidential relationship exists "when the circumstances make it certain the parties [did] not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed." [180]

A confidential relationship exists when one person occupies a position so as to reasonably inspire confidence that he will act in good faith for the other's interest or occupies a position over another, intellectually, physically or morally, with the opportunity to use the superiority to other's advantage.[181] Any relations "existing between parties to a transaction wherein one of the parties is bound to act with the utmost good faith for the benefit of the other party and can take no advantage to himself from his acts" relating to the other party is "confidential." [182]

a cognitive disorder, most likely dementia. 11/6/02 N.T. (I) 29, 48-49. Dr. Rothman also agreed that many of decedent's symptoms during the months before the creation of the account—*e.g.* paranoia, lack of insight into his illness, inability to manage finances, were consistent with dementia. 11/6/02 N.T. (I) 66-73, 76-77, 81-83, 87-90.

180. *Leedom v. Palmer,* 274 Pa. 22, 25, 117 A. 410, 411 (1922); *Clark,* 461 Pa. at 63, 334 A.2d at 633. The Superior Court has affirmed that this is a disjunctive standard, *i.e.* that a party may show a confidential relationship by showing either overmastering influence or weakness, dependence or trust, justifiably reposed. *Basile v. H & R Block Inc.,* 777 A.2d 95 (Pa. Super. 2001), *appeal denied,* 569 Pa. 714, 806 A.2d 857 (2002).

181. *Estate of Keiper v. Moll,* 308 Pa. Super. 82, 86, 454 A.2d 31, 33 (1982); *Weir by Gasper v. Estate of Ciao,* 521 Pa. 491, 504-505, 556 A.2d 819, 825 (1989).

182. *In re Estate of Mihm,* 345 Pa. Super. 1, 7, 497 A.2d 612, 615 (1985). (citations omitted)

In *DiMaio Will No. 1*,[183] Judge Wood held that the factors indicative of confidential relationship should not be compartmentalized, but considered altogether. Then, as a general matter, Judge Wood found the existence of a confidential relationship. The *totality of circumstances* here clearly and convincingly prove confidential relationship:

• Mazzei testified that decedent trusted her;[184]

• decedent allowed only Mazzei and Squitieri to perform his transactions.[185] They, in turn, fostered this trust by allowing withdrawals without a passbook;[186]

• Mazzei and Squitieri worked at the financial institution, and as employees of the institution, owed decedent certain fiduciary duties, including being bound to act with the utmost good faith for decedent's benefit and to take no advantage for themselves from their acts relating to decedent,[187] which by definition is a confidential relationship;[188]

• decedent's entrustment of his passbook to Mazzei and Squitieri, clearly indicated his confidence in the bank and the managers;[189]

• Mazzei assisted decedent with his financial affairs and in taking care of his money. Vento testified that

---

183. 8 Fiduc. Rep. 2d 370, 373, 375 (O.C. Chester 1988).

184. 11/4/02 N.T. 44.

185. 11/4/02 N.T. 44-45.

186. 11/4/02 N.T. 0-61.

187. See *Dichter Will,* 354 Pa. 444, 47 A.2d 691 (1946); *McGuire v. Shubert,* 722 A.2d 1087 (Pa. Super. 1998); accord *In re Estate of LeVin,* 419 Pa. Super. 89, 615 A.2d 38 (1992).

188. *In re Estate of Mihm,* 345 Pa. Super. 1, 7, 497 A.2d 612, 615 (1985).

189. 11/4/02 N.T. 203-206.

Mazzei stated that she had been helping decedent with his affairs;[190]

• decedent entrusted his funds "to" not "for" Mazzei and Squitieri;[191]

• decedent did trust Mazzei and Squitieri as evidenced by the fact that when they told decedent that he needed to open a new savings account to establish direct deposits, he believed them and acted on that direction;

• decedent trusted the bank and its employees as members of his own community. He believed that neither the bank nor its employees would mislead or misguide him. He trusted them as a child trusts its parents.

All of these factors, together with the general principle, agreed to by Vento, that the bank's customers trust the bank to act in their best interests[192] prove that Mazzei and Squitieri stood in a confidential relationship with decedent.

---

190. 11/6/02 N.T. (II) 39-42. The court accepts Vento's testimony as true over Mazzei's conflicting testimony.

191. See P-7. The prepositional distinction "to" not "for" suggests to the court that decedent believed Mazzei and Squitieri would safeguard his money, in life, and not necessarily receive it upon his death. Additionally, owing to the fact that decedent did not read the trust account agreement, P-8, P-7 is the only significant expression of decedent's understanding of the account.

192. For example, the customers complete a proxy form in favor of the bank's board to vote in the customers' best interests.

## B. The Estate Has Proven Direct Undue Influence by Clear and Convincing Evidence

### (1) *Mazzei's and Squitieri's misdeeds at the creation of the account prove fraud*

In August of 2000, decedent was paranoid and incapable of tracking his finances. In his condition, he sought Mazzei's and Squitieri's assistance in rerouting his social security direct deposit into his existing account at the bank. Mazzei and Squitieri misrepresented that for decedent to switch his direct deposit he would need to open a new account. Decedent believed Mazzei and Squitieri. Having no reason to doubt the veracity of Mazzei and Squitieri's representation, decedent relied upon that representation as true. On their own part, Mazzei and Squitieri knew that decedent would not verify their representation with an attorney. The representation, however, was patently false.

Mazzei and Squitieri capitalized on decedent's trust in them, and opened the ITF through the employ of various artifices including the lost passbook affidavit;[193] and the consumer account agreement.[194]

---

193. P-9; P-9a. The document, bearing "Affidavit" in its title, requires a notary's attestation. Mazzei admitted that her failure to obtain attestation violated the bank's policy. 11/4/02 N.T. 81. The bank now claims that the attestation was only necessary if the affidavit was completed outside the bank. First this position is contradicted by the clear requirements on the document's face. Second, the document is expressly entitled "Affidavit," meaning taken under oath and notarized. Third, Mazzei acknowledged that the lack of attestation violated the bank's policy. 11/4/02 N.T. 81. Had a notary been present, Mazzei and Squitieri could not have executed their scheme. Mazzei's and Squitieri's failure to pursue proper attestation according to the bank's policy, bespeaks their intended isolation of decedent.

194. P-25, which ordinarily would be pre-printed before the intended account holder signed it. 11/4/02 N.T. 52-54, 84. In this in-

Additionally, P-7 is Mazzei's handwritten document by which decedent purports to put "the account in trust *to*" not "*for*" Mazzei and Squitieri.[195] This discrepancy further evidences decedent's belief that he was entrusting his funds into the care of Mazzei and Squitieri, and not leaving the funds "for" them upon his demise.[196]

## (2) *The elaborate and fraudulent asset transfers prove culpable behavior*

Mazzei's and Squitieri's transfers, particularly those occurring after Palmieri told them that he had met with decedent's nieces and after Mazzei and Squitieri had met with estate's counsel, evidence their consciousness of

---

stance, the consumer account agreement for the ITF account is handwritten. See P-25. This inconsistency with procedure, along with the significant doubt as to the veracity of their respective testimony, suggests to the court that the document was blank when decedent signed it, and that either Mazzei or Squitieri subsequently added the information.

In fact, Mazzei admitted that decedent never read P-8, the trust account signature card, containing the ITF account's terms and conditions. 11/4/02 N.T. 83; 11/6/02 N.T. (I) 100. According to Mazzei, the writing on P-8 was too small. 11/4/02 N.T. 83. Yet, the writing on both P-25, which decedent allegedly could read, and that of P-8, which allegedly was too small for decedent to read, were of a similar size. These inconsistencies lead the court to believe that decedent, in reality, never read the key documents that established the ITF account, that he was not informed of their meaning or their consequence, and that he relied upon Mazzei and Squitieri in creating the account.

195. See P-7.

196. The understanding that decedent intended to entrust his funds, merely into the care of Mazzei and Squitieri is supported by the fact that decedent provided Mazzei and Squitieri with his original passbook as caretakers, and that they responded by providing a duplicate passbook to decedent with which he could not conduct business.

the weakness of their case, *i.e.* their fraud, and, therefore, are admissible.[197] Mazzei and Squitieri violated rules and policy in absconding with the ITF funds, thereby proving their awareness that their actions and the circumstances surrounding the creation of the ITF account would not withstand scrutiny.

The fraudulent transfers also prove a common plan or scheme among Mazzei and Squitieri to defraud decedent.[198] The post-death transfers prove that Mazzei and

197. According to Packel and Poulin:

"There are many situations in which a party may offer evidence of the opposing party's conduct as circumstantial evidence that the opposing party was conscious of . . . the weakness of his case. This evidence has generally been treated as relevant and, therefore, admissible. It should continue to be admissible under the Pennsylvania Rules of Evidence." Pennsylvania Evidence (2d ed.) §265 (cited in *Commonwealth v. Derby*, 27 D.&C.4th 121 (York Cty. 1994) (suicide attempt admissible to prove consciousness of weakness of case)).

McCormick and Wigmore agree and provide concrete examples of admission by conduct. McCormick notes:

"As might be expected, wrongdoing by the party in connection with its case amounting to an obstruction of justice is also commonly regarded as an admission by conduct. By resorting to wrongful devices, the party is said to provide a basis for believing that he or she thinks the case is weak . . . . Accordingly, the following are considered under this general category of admission by conduct: . . . hiding or transferring property in anticipation of judgment." McCormick, *Evidence* §265 (4th ed. 1992).

Wigmore adds:

"The opponent's conduct in taking precautions to prevent an apprehended injury may sometimes indicate a consciousness of wrong . . . . For example, . . . the *conveyance of property,* during litigation or just prior to it, may be evidence of the transferor's consciousness that he ought to lose." 2 Wigmore, *Evidence* §282 (Chadbourn Rev. 1979). (emphasis in original)

198. Evidence Rule 404(b)(2) provides that:

"Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, prepara-

Squitieri worked together in a common plan (1) to unduly influence or confuse decedent into naming them as beneficiaries of the ITF account, and (2) to obtain and remove ITF funds from the bank before decedent's living relatives could discover, and pursue the account's funds. For example, Mazzei and Squitieri cooperated with each other in conducting several transactions to move over $400,000 in two days from an account that they both held.

## C. Respondents Have Not Met Their Burden of Disproving Undue Influence

Because the estate proved undue influence, respondents bear the burden of proving the absence of undue influence, and bear the risk of non-persuasion. Ordinarily, when a petitioner proves only indirect, or *Clark*, undue influence, a respondent "has two options: he can attack the basic facts upon which the presumption rests, and/or he can present evidence to rebut the presumption itself."[199] In the present matter, petitioners satisfactorily proved both indirect and direct undue influence. As a matter of law, therefore, respondents must affirmatively disprove undue influence. Respondents did not disprove undue influence.

---

tion, plan, knowledge, identity, or absences of mistake or accident." Pa. R.E. 404(b)(3); see also, *Commonwealth v. Nolen*, 535 Pa. 77, 634 A.2d 192 (1993) (evidence of other acts admissible in negligence action to show motive, intent, absence of mistake, common scheme, plan or design).

199. *The Presumption of Undue Influence and the Shifting Burden of Proof*, 18 Fiduc. Rep. 2d 348, 361, James Mannion (1998).

### (1) *Mazzei and Squitieri have no credibility before this court*

In evaluating credibility, the court considers a witness' interest or lack thereof in the outcome.[200] Mazzei and Squitieri have over 560,000 obvious interests in the outcome of this case. Moreover, by virtue of their fraudulent transfers to friends and family, Mazzei and Squitieri now face great personal embarrassment should the court rule against them.

To keep the estate's money and to avoid reversal of fraudulent transfers, Mazzei and Squitieri went to elaborate lengths. In one instance, Mazzei lied to cover a lie, which in its own course covered a previous lie. In other instances, Mazzei[201] and Squitieri[202] forgot earlier testi-

200. *Masciantonio Will,* 392 Pa. 362, 141 A.2d 362 (1958).

201. In part, Mazzei's false testimony addressed such material issues as follows:

• on the first day of trial, Mazzei said that she observed no changes in decedent's mental condition from 1998 through October 2000. 11/4/02 N.T. 49. The medical records, Albert Johnson's testimony, Angelina Destra's testimony, Roxanne Rivera's testimony and expert medical testimony portray a man whose mental condition had deteriorated visibly and noticeably to lay observers. 11/5/02 N.T. (II) 106.

• expert testimony that on 21 September 2000, a date upon which Mazzei admits to have seen decedent, decedent was suffering from a "delirium" which would have been apparent to lay observers who saw decedent that day contradicts Mazzei's testimony that she observed no changes in decedent's condition. Subsequently, on 7 November 2002, Mazzei attempted to minimize her 21 September contact with decedent in testifying:

"He didn't spend much time there. I remember he asked how the wedding was. I told him it was very nice. He asked me if I got drunk. And I told him, no. And that is about the extent of the conversation we had that day."

But, Mazzei on 4 November 2002 testified that on 21 September 2000, she and decedent also discussed that decedent had been to St.

mony, and proceeded to contradict themselves and each other on such material issues as decedent's mental and physical well-being, and the account's creation. These

---

Agnes over the weekend of 20 September, and that decedent could not remember why he had gone to St. Agnes. 11/4/02 N.T. 232-33.

• Mazzei testified that decedent's desire to switch his direct deposit coupled with the lost passbook triggered the ITF account's creation. 11/4/02 N.T. 62. Mazzei said that she could not set up direct deposit on an account for which no passbook existed. 11/4/02 N.T. 62-63. Yet Vento, banking expert William Wagenmann, and even Mazzei agreed that direct deposit required merely an account number and a bank routing number. 11/4/02 N.T. 62-63, 11/5/02 N.T. (I) 70-71.

• Mazzei claimed that she told decedent that Vento suggested that decedent speak with an attorney. 11/4/02 N.T. 72-73. Yet, Mazzei and Vento testified that Vento made the suggestion during the 8 August conference call. Mazzei claims that she was holding the phone to her ear and that she was not covering the transmitter when she relayed the suggestion to decedent. 11/4/02 N.T. 72-73; 11/6/02 N.T. (I) 199-200. Vento said that he did not hear Mazzei relay the suggestion, and confirmed his and Corrato's deposition testimony that their own conversation with Mazzei was continuous. 11/6/02 N.T. (I) 200-201. See Rule of Civil Procedure 4020(a)(2)-(3) for admissibility and usage of deposition testimony, and Evidence Rule 803(25) governing "admissions" which requires that the party's statement be made either in an individual or representative capacity or a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

• Mazzei testified that there was no duplicate passbook, *i.e.* that only one passbook existed for the ITF account. 11/4/02 N.T. 207-208. Squitieri confirmed that she created a duplicate passbook. 11/7/02 N.T. 102.

• Mazzei's testimony clearly implied that she did not know whether decedent had given Squitieri a gold ring. 11/4/02 N.T. 278. Squitieri testified that Mazzei knew about the ring. 11/7/02 N.T. 110.

• Mazzei testified that she and Squitieri handwrote the consumer account agreement because the computer printer was jammed. 11/4/02 N.T. 86. However, Mazzei could not provide any repair record to support such claim.

material falsehoods lead the court to entirely disregard both Mazzei's and Squitieri's testimony.[203]

---

• Mazzei testified in deposition that she never transacts business or records interest in passbooks which she retains in the bank. 11/4/02 N.T. 240-41 quoting Mazzei deposition. At trial, however, Mazzei admitted that on 18 October 2002, she recorded decedent's 3 October 2000 social security deposit. 11/4/02 N.T. 240-41, referring to P-11 at PR000064, line 3.

• confronted with the 14 November entry reflecting the social security deposit, Mazzei said that "we knew [decedent] wasn't coming in . . . because he was in the nursing home or in Cambridge." 11/4/02 N.T. 242-43. Moments later, Mazzei admitted that "on the 14th [she] didn't know [decedent] wasn't coming in . . . I knew it on the 16th." 11/4/02 N.T. 243. Eventually, Mazzei admitted that her stated reasons for conducting transactions in decedent's absence were not true. 11/6/02 N.T. (I) 106.

• Mazzei testified that she did not know decedent had living family. 11/4/02 N.T. 47. Yet, Vento testified that on 8 August, Mazzei referred to a niece living in New Jersey. 11/6/02 N.T. (II) 39-42. Corrato's deposition testimony affirms this. 11/4/02 N.T. 48-49. Further, Mazzei's and Squitieri's use of eight accounts to launder money indicates that she and Squitieri were trying to make things difficult for any other persons, *i.e.* relatives, who might eventually discover and seek to trace the account proceeds.

202. Squitieri testified for significantly less time than did Mazzei, but her misrepresentations and contradictions are no less significant:

• Squitieri claimed in deposition that she had no role in opening the ITF account or in completing the consumer account agreement. 11/7/02 N.T. 36-39. Then, confronted with the handwritten consumer account agreement, P-25, she admitted it was her handwriting. 11/7/02 N.T. 38-39; see also, 11/4/02 N.T. 84-85.

• Squitieri affirmed at trial the deposition testimony that Squitieri claimed she had no role in setting up the social security direct deposit on the ITF account. 11/7/02 N.T. 41. She then conceded that P-26, the direct deposit form, bore her signature. 11/7/02 N.T. 41-42.

203. *Underwood v. Pittsburgh Railways Co.,* 238 Pa. 332, 86 A. 184 (1913); *Commonwealth v. Sisco,* 484 Pa. 85, 89, 398 A.2d 955, 957 (1979); *Burns v. Pepsi-Cola Metropolitan Bottling Co.,* 353 Pa. Super. 571, 510 A.2d 810 (1986).

.

## (2) *Respondents' lay witnesses did not disprove undue influence*

Respondents presented three non-party lay witnesses, as follows:

Anthony Scarpa has known Mazzei for over 30 years and visits the bank daily for coffee and cake.[204] He testified that he saw decedent during the summer of 2000, that he and decedent discussed "current events," and that decedent provided him with a general update on the neighborhood.[205] Mr. Scarpa's testimony lacks specificity. He did not provide a single, specific recollection of any topic that he discussed with decedent. Further, Mr. Scarpa admitted that he saw decedent just once per week.[206] Notably, Mr. Scarpa did not address decedent's testamentary intent vis-à-vis Mazzei or Squitieri.

Paul Perpiglia voluntarily came forward in this matter in November 2002.[207] Mr. Perpiglia informed the court that on or about 3 August 2002, he was present in the bank, at which time he met decedent for the first and only time.[208] Mr. Perpiglia claims to have spoken intermittently with decedent during a 30-40 minute period.[209] They allegedly discussed decedent's feelings toward attorneys, but Mr. Perpiglia did not "delve into [decedent's] reasoning." [210] They allegedly discussed sports, but Mr.

---

204. 11/6/02 N.T. (II) 152-53.
205. 11/6/02 N.T. (II) 156-57.
206. 11/6/02 N.T. (II) 160.
207. 1/28/03 N.T. 15-16.
208. 1/28/03 N.T. 19-20.
209. 1/28/03 N.T. 19.
210. 1/28/03 N.T. 9.

Perpiglia recalls no particularities of the conversation.[211] Likewise, they allegedly discussed the neighborhood, but only "in general" terms.[212]

Mr. Perpiglia did not witness decedent conduct any personal transactions.[213] He did not see anyone else speaking with decedent.[214] He and decedent did not discuss estate planning or financial concepts.[215] While the court appreciates Mr. Perpiglia's time, his testimony is of no moment.

Ms. Giacobbe's testimony also does not disprove undue influence. This court does not doubt that she attended to decedent during his brief visit to St. Agnes on 16 September 2000. However, Ms. Giacobbe's testimony did not address decedent's cognitive functioning. Neither did Ms. Giacobbe's testimony reveal decedent's abilities in planning, sequencing, organizing, or abstracting as those tasks relate to one's intent in disposing of one's funds.[216]

---

211. 1/28/03 N.T. 16-17.

212. 1/28/03 N.T. 9.

213. 1/28/03 N.T. 18.

214. 1/28/03 N.T. 23. Mr. Perpiglia only saw decedent exchanging greetings with elderly bank patrons. 1/28/03 N.T. 22.

215. 1/28/03 N.T. 20-21.

216. The annotation of "normal" pertaining to decedent's mental condition appearing in the St. Agnes medical records for 16 September 2000 is an uncorroborated conclusion, especially when considered in conjunction with the testimony of Dr. Streim, and Dr. Scola. Both Dr. Streim and Dr. Scola agree that emergency room examinations are not in-depth, and that systems reviews are designed to turn up only those problems that the patient reveals to the medical personnel. 11/5/02 N.T. (III) 25-26; 1/28/03 N.T. 111. Finally, provided decedent was able to recall his name, and possibly his social security number, Ms. Giacobbe could retrieve all of the other information appearing in decedent's chart from previous hospital records.

### (3) *Dr. Scola's expert testimony provides no plausible insight for the court*

Dr. Scola proclaimed that decedent was not suffering from dementia, but rather from geriatric depression. This conclusion is contradicted by four treating physicians and two experts, Drs. Streim and Rothman.[217] Dr. Scola presented as an expert on speculation and contradiction.

---

217. During his 82-page cross-examination, Dr. Scola:

• admitted that he submitted his draft opinion to Mazzei and Squitieri's counsel, and Mazzei and Squitieri's counsel suggested that Dr. Scola remove from his report certain statements which favored the estate, 1/28/03 N.T. 59-61;

• relied greatly upon Mr. Perpiglia's and Ms. Giacobbe's statements because he viewed Mr. Perpiglia and Ms. Giacobbe as expert observers, 1/28/03 N.T. 61-62, but admitted that he had never met either Mr. Perpiglia or Ms. Giacobbe, 1/28/03 N.T. 99; that he did not know how long Ms. Rivera and Mr. Johnson, witnesses whose statements he disregarded, knew and observed decedent; and that he did not include the observations of Dr. Renzi's physician's assistant, 1/28/03 N.T. 66-67;

• stated that decedent's January 1998 forgetfulness complaints indicated a depression, not dementia, because dementia patients rarely complain about forgetfulness, but subsequently admitted that forgetfulness complaints are not uncommon in early stage dementia, which is exactly what decedent would have been suffering from when he complained of his forgetfulness, 1/28/03 N.T. 66-67;

• acknowledged that Dr. Renzi's prescription of Aricept indicates that Dr. Renzi believed as early as March 1998 that decedent suffered from mild dementia; and that difficulties balancing a checkbook or paying bills, with the instrumental activities of daily living, recalling newly learned or complex information, taking medications on a consistent schedule, are consistent with a mild dementia, 1/28/03 N.T. 70-71;

• conceded a lack of insight and refusal of treatment for mental impairment are common in persons suffering from dementia, 1/28/03 N.T. 72;

• admitted that his report does not mention dramatic change in how frequently decedent visited both Prudential and Sharon Savings, 1/28/03 N.T. 73;

## 2. *Prudential Is Vicariously Liable for Its Employees' Acts*

### A. Standard and Burden of Proof

The respondeat superior doctrine imposes vicarious liability upon an employer for its employees' wrongdo-

---

• agreed that the MMSE is an objective standard test, that he had no reason to think that Dr. Renzi improperly administered the test or did not consider decedent's age and educational background, that he has no reason to doubt Dr. Renzi's professional integrity, and that he has no idea how long Dr. Renzi's visits with decedent lasted, 1/28/03 N.T. 75-78;

• acknowledged that he did not know that the average MMSE score for an 85-year-old was a 25, 1/28/03 N.T. 80-81;

• conceded that Carmen's paranoia and inability to track finances comported with dementia, 1/28/03 N.T. 88-89;

• admitted that loss of brain tissue was not inconsistent with dementia, 1/28/03 N.T. 92;

• asserted that he assumed certain facts about Mr. Perpiglia's encounter with decedent, including that Mr. Perpiglia "examined" decedent and that Mr. Perpiglia and decedent "debated" certain issues, 1/28/03 N.T. 110-12;

• asserted that decedent's weight loss was a significant factor in why he believed decedent suffered from a depression, but agreed that the weight loss did not occur until September 1999, or nine months after decedent scored a 22 on the MMSE, 1/28/03 N.T. 94-97;

• admitted that he misstated Dr. Streim's conclusions, 1/28/03 N.T. 114;

• acknowledged that current medical thinking views depression as an early harbinger of an actual dementia, and 1/28/03 N.T. 116-17, see also, P-75, P-76, P-77;

• conceded that decedent's trips from his home to the bank and to Sharon Savings, St. Agnes, and Albert Johnson's home did not involve any complex high level cognitive functioning. 1/28/03 N.T. 155-56; P-78.

The list of examples could go on indefinitely and yet prove no more valuable to this court in disproving undue influence, than had Dr. Scola not testified at all.

ing.[218] An employer is vicariously liable for employee acts which injure a third party when the acts were committed during the course, and within the scope, of employment.[219] An employee's conduct falls within the "scope of employment"[220] if: "(1) it is of a kind and nature that the employee is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is actuated, at least in part, by a purpose to serve the employer; and (4) if force is intentionally used by the employee against another, the use of force is not unexpected by the employer."[221]

The burden of proving respondeat superior or scope of employment rests with the estate.[222] Unlike undue in-

---

218. A principal is liable to innocent third parties for the frauds, deceits, concealments, misrepresentations, torts, negligence and other malfeasances or misfeasances of his agent committed in the course of his employment, although the principal did not authorize, justify or participate in, or indeed know of, such misconduct, or even if he forbade the acts or disapproved of them. *Solomon v. Gibson,* 419 Pa. Super. 284, 293, 615 A.2d 367, 371 (1992) quoting *Aiello v. Ed Saxe Real Estate Inc.,* 508 Pa. 553, 559, 499 A.2d 282, 287 (1985). (emphasis added) The respondeat superior doctrine unquestionably applies to an undue influence claim. The doctrine applies to employee wrongdoing, regardless of whether it sounds in tort, contract, fraud, or equity.

219. *Costa v. Roxborough Memorial Hospital,* 708 A.2d 490 (Pa. Super. 1998), *appeal denied,* 556 Pa. 691, 727 A.2d 1120 (1998), citing *Fitzgerald v. McCutcheon,* 270 Pa. Super. 102, 107, 410 A.2d 1270 (1979).

220. *Id.* at 493, citing *Fitzgerald,* 270 Pa. Super. at 107, 410 A.2d at 1272 and Restatement (Second) of Agency, §228.

221. The facts of this case do not implicate the use of physical force and it is unnecessary to show use of force to establish an employer's vicarious liability.

222. *Davis v. Clear Lake Lumber Inc.,* 6 D.&C.4th 67, 68 (Warren Cty. 1989).

fluence, which requires clear and convincing evidence, a finding under vicarious liability requires only that the estate produce a fair preponderance of credible evidence.[223] The estate has carried that burden.

## B. Mazzei and Squitieri Acted Within the Scope of and by Virtue of Their Employment With the Bank

Mazzei and Squitieri acted within the scope of employment and not a single witness came forth to the contrary. It fell within their employment for Mazzei and Squitieri:

• to interact with, and to open accounts on behalf of bank customers;

• to create documents opening accounts;

• to duplicate and retain decedent's passbook;

• to fund the ITF account; and

• to develop the trust that obviously existed between Mazzei and Squitieri by the time decedent ingenuously "agreed" to assign them as beneficiaries of the ITF account.

Mazzei and Squitieri's actions and interactions with decedent took place at the bank and during business hours. But for their employment at the bank, neither Mazzei nor Squitieri would have had any occasion to interact with decedent. Further, but for their employment at the bank, Mazzei and Squitieri lack the wherewithal to hatch their scheme. The bank, therefore, is vicariously liable for the consequences of that scheme.[224]

---

223. *Cooper v. Franko,* 28 D.&C.4th 44, 78 (Phila. Cty. 1996).

224. See *Travelers Casualty & Surety Co. v. Castegnaro,* 565 Pa. 245, 772 A.2d 456 (2001) (employer liable for acts of agent who fraudu-

Finally, the bank profited from the relationship between decedent and the bank employees, Mazzei and Squitieri. As with all banks, profit is realized in the difference between the use of and subsequent earnings on depositors' monies, and the interest a given bank pays out to its customers. Specifically, the bank significantly benefited by the $450,000 net increase in its deposits on decedent's account.

### 3. *Prudential Negligently Supervised Mazzei and Squitieri*

Pennsylvania courts impose liability on employers directly when, inter alia, they negligently or recklessly:[225]

• give improper or ambiguous orders or fail to make proper regulations; or supervise activities; or

• permit or fail to prevent negligent or other tortious conduct by persons, whether or not his servants or agents, upon the premises or with instrumentalities under his control.

The burden of proving negligent supervision falls upon the estate, which must do so by a preponderance of evidence. The estate has provided overwhelming evidence

lently represented to policyholders that policies had been renewed, but cashed premium checks for personal use; employer placed agent in position of trust); *Butler v. Flo-Ron Vending Co.,* 383 Pa. Super. 633, 557 A.2d 730 (1989) (employer liable for supervisor's defamation and malicious prosecution where supervisor planted evidence to frame another employee for burglary; within nature of supervisor's job to cooperate with authorities in solving the burglary case, supervisor's efforts were within the time and space limits of employment, and efforts were for corporation's benefit).

225. *R.A. v. First Church of Christ,* 748 A.2d 692, 697 (Pa. Super. 2000), citing Restatement (Second) of Agency §213 (1958).

in demonstrating that the bank negligently allowed the ITF account to be created, and negligently permitted Mazzei and Squitieri to dissipate assets.

## A. Prudential's Negligent Environment

Negligence and inconsistency permeate the bank's environment. The bank does not train employees on interacting with the elderly or mentally impaired, and has no written or consistently applied conflict of interest policy.[226] In fact, it appears to the court that many of the innovations and controls of the last, 72 years have never taken root in Prudential Savings Bank.

Throughout the trial, the court heard evidence of the bank's selective application of account opening policies and procedures, and unwritten exceptions or modifications to nearly every bank policy applicable to the transactions and documents at issue.[227] Both Mazzei and Squitieri exploited this procedurally liquid environment. Their cooperative manipulation of the bank's internal operating systems belies their claim of innocent intent.[228]

---

226. 11/4/02 N.T. 35, 40, 42; 11/6/02 N.T. (II) 10.

227. For example:

• The lost passbook affidavit requires notary attestation. See P-9a. No written policy exceptions exist. Yet, Mazzei stated that the bank routinely does not insist on a notary;

• The bank passbooks state that a Prudential customer present a passbook before making a withdrawal. P-11 at PR000063, 64, 65. No written policy exceptions exist. Yet, the bank frequently allows customers to make withdrawals without a passbook;

• The bank's written policy requires management approval of all withdrawals over $500, whether made by check or cash. P-19 at PR000025, ¶5. Yet, the bank representatives claim that policy has been modified to $1,000. Yet, no written document supports this assertion.

228. For example, they knew that internal journal debits over $1,000 would not trigger the approval requirement for withdrawals, whereas

The bank's environment, and lack of meaningful controls proved fertile soil for the undue influence at issue. Would that proper policy and restriction had first been sown thereon.

The sequence of events preceding the creation of the ITF account follow. On 8 August 2000, Mazzei effectively told Vento that a mentally-impaired, elderly customer with several hundred thousand dollars, and with whom she had formed a close friendship, wanted to name her and Squitieri as ITF account beneficiaries. Mazzei knew that Vento, over his own instincts, would ultimately accept her representation that decedent did not want to consult an attorney. Moreover, Mazzei knew that when the bank's counsel did get around to reviewing the transaction, he would do no more than speak to her on the phone without requesting documents or asking to speak with decedent. Additionally, Mazzei and Squitieri, knew that the bank had no procedural controls to catch document irregularities, and that if the irregularities were discovered, the irregularities would be dismissed as business as usual. During the bank's business as usual, the missing notary attestation, the handwritten consumer account agreement, and the duplicate passbook all went undetected by the authorities within the bank.

---

cash or check withdrawals of over $1,000 would. They consequently manipulated money from account to account through an elaborate weave of deception. When they did withdraw funds exceeding $1,000, they delicately circumvented the prohibition against conducting transactions in one's own account by approving each other's transactions.

## B. Prudential Negligently Supervised the ITF Account Opening

The bank's negligence on 8 August began with the Mazzei/Vento telephone call. At trial, Vento admitted that in that call he authorized Mazzei and Squitieri to open the ITF account even though he should not have.[229] Remarkably, neither Vento nor, indeed, anyone else has explained why the bank failed to send Botta, Corrato, or anyone, including Vento, the six blocks from Oregon Avenue to Snyder Avenue to verify the transaction.[230] Further, no one has explained why the transaction was not delayed by one day, or why Prudential's counsel never met or spoke with decedent.

---

229. "Q. Are you saying that in the original conversation with [Mazzei] you suggested that [Vice President of Branch Operations] Maria Botta handle the account?

"A. I believe so. It was at that conversation or a subsequent conversation that I suggested the transaction be handled by someone else. Whether I mentioned Lucy Cohen or another officer or Maria Botta, I don't remember which one I suggested. *But I knew it shouldn't be done by [Mazzei and Squitieri].*

"Q. You do agree the two of them alone should not handle that account?

"A. Make the transfer to a trust?

"Q. Make the transfer to the trust and create the documents by which the account was established and by which they were named account beneficiaries?

"A. Right.

"Q. Better practice would have be[en to have had] someone else do it?

"A. Yes.

"Q. Because that was you ensure the integrity of the transaction.

"A. Yes." 11/6/02 N.T. (II) 52-53.

230. In marked contrast, when decedent expired, Botta did travel the six blocks to ensure that the funds were properly transferred to Mazzei and Squitieri.

Banking expert William Wagenmann testified that the bank's failure to independently investigate and verify decedent's intent did not comport with reasonable banking industry standards.[231]

The bank's negligence extended beyond the initial telephone call. Mazzei and Squitieri violated the bank's procedure when they handwrote the consumer account agreement. The bank, on its part, failed or had no control in place to detect this irregularity. The bank should have detected this irregularity.[232] The bank's counsel simply relied upon Mazzei's representations in shirking its own responsibility of due diligence. This blind reliance runs contrary to reasonable banking industry standards.[233]

Had the bank operated according to reasonable banking industry standards, the transaction at issue either would not have occurred, or at the very least, would have been investigated and reversed almost immediately. The

---

231. 11/5/02 N.T. (I) 65-66. To comport with reasonable standards, the bank should have:

• investigated the transaction and the nature of Mazzei's and Squitieri's relationship with decedent;

• assured itself that Mazzei and Squitieri had not unduly influenced decedent;

• confirmed decedent's mental competency;

• confirmed decedent's intent;

• confirmed decedent's understanding;

• delayed the transaction, if it had any concerns regarding decedent's mental ability, intent, or understanding;

• had someone other than Mazzei and Squitieri open the ITF account. 11/5/02 N.T. (I) 65-70, 78-80, 88-89. The bank did none of these.

232. 11/5/02 N.T. (I) 72. Similarly, the bank failed to detect that the lost passbook affidavit, P-9a, was not notarized. The bank's counsel knew about but took no real steps to investigate the transaction.

233. 11/5/02 N.T. (I) 73.

court, therefore, holds the bank jointly and severally liable with Mazzei and Squitieri.[234]

The bank's negligent supervision defense rests upon the testimony of Attorney Paul Adams. Mr. Adams' testimony did not disprove the bank's negligence. In sum, Mr. Adams endeavored to convince the court that the bank did not act negligently because there are no banking industry standards of care applicable to opening an ITF account at an institution of the bank's size. His conclusion does nothing to persuade the court of its accuracy. In fact, during his testimony, Mr. Adams went so far as to contradict Vento's testimony that Mazzei and Squitieri should not have opened the account in the first place.[235] During testimony, Mr. Adams did concede:

• that it would have been "good practice" and "common sense" for the bank to have verified decedent's intent; [236] and amongst others

• that he did not consider that Mazzei and Squitieri had observed changes in decedent's behavior.[237]

The bank negligently supervised Mazzei and Squitieri in failing to have procedures in place to detect their quid pro quo asset transfers through, and eventually out of the bank's system. Vento has testified that Botta should have conducted or approved all of the September 24 and 25 transfers. But Botta did not conduct or approve those transfers. The bank should have had a control in place to detect the quid pro quo. But the bank did not. Thus,

---

234. See *Heller v. Patwil Homes Inc.*, 713 A.2d 105 (Pa. Super. 1998) (home sales company negligently supervised manager who used office to convince potential buyers to invest in side ventures; employer should have known what manager was doing in office).

235. 1/9/03 N.T. 61.

236. 1/9/03 N.T. 55, 58.

237. 1/9/03 N.T. 83-84.

Mazzei and Squitieri moved roughly $408,000 out of the bank in two days without detection. When this court ordered Mazzei and Squitieri to place into escrow all remaining ITF funds, they deposited only $184,000. Consequentially, the estate has suffered at least a $224,000 loss owing to those September 24 and 25 transfers in addition to the nearly $156,000 that Mazzei and Squitieri had removed before September 24.[238] The bank's failure to undo these transfers after it learned of them proves the bank's direct negligence.

## CONCLUSION

After a thorough consideration of all of the facts and circumstances surrounding this case, the court reverses the ITF account's creation and grants the petition for turnover of assets. The court holds respondents Mazzei, Squitieri, and Prudential Savings Bank jointly and severally liable for the amount contained in the ITF account as of decedent's death, less taxes and funeral expenses. Pursuant thereto, the court enters judgment in the amount of $563,767.40, together with interest, costs, and attorneys' fees.

## ORDER

And now May 5, 2003, after a thorough consideration of all of the facts and circumstances surrounding this present matter, the court hereby orders and decrees a reversal in the creation of the ITF account at issue, that account which favored respondents Mazzei and Squitieri as beneficiaries, and hereby grants the relief sought by petitioner in approving the petition for turnover of assets.

---

238. This court understands that exclusive of funeral expenses, taxes, and decedent's debts, the ITF proceeds should have amounted to $563,767. As of 24 September, only $408,000 remained at the bank. Thus Mazzei and Squitieri moved roughly $156,000 through, and out of the bank before 24 September 2000.

Further, the court holds respondents Mazzei, Squitieri, and Prudential Savings Bank jointly and severally liable for the exact and total amount contained in the ITF account upon the date of decedent's death, less taxes and funeral expenses. Pursuant thereto, the court enters judgment in the amount of $563,767.40, together with interest, costs, and attorneys' fees to petitioner on behalf of the estate of Carmen DiCesare, deceased.